Stephen C. Woodruff
Attorney and Counselor at Law
P. O. Box 500770
Saipan, MP 96950
Tel.:    +1 (670) 989-2797
Fax:    +1 (808) 356-1349
Email: scwlaw.spn@gmail.com

*In Pro Per*

FILED
Clerk
District Court

JUN 1 4 2016

for the Northern Mariana Islands
By_____
(Deputy Clerk)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

IN RE STEPHEN C. WOODRUFF,       )       Case No. 1:13-MC-00061
                                 )
                                 )
        Respondent.              )       **RESPONSE TO PROSECUTING**
                                 )       **COUNSEL'S DISPOSITION**
                                 )       **MEMORANDUM**
                                 )
_____  )

    COMES NOW, Respondent, Stephen C. Woodruff, and submits the following response to the memorandum filed herein by Prosecuting Counsel on May 31, 2016, styled "Disposition Memorandum: Factors in Aggravation." ECF No. 46. Although purporting to be a memorandum setting forth aggravating factors relating to the disciplinary charges pled in the Complaint for Ethical Violations, ECF No. 10, it is in reality nothing of the sort. Instead, it is a patent manifestation of what has now been clearly revealed to be a personal vendetta against Respondent by Prosecuting Counsel, Rexford C. Kosack, Esq., in a continuing effort to destroy Respondent professionally and economically and thus silence his voice and excoriate his ability to advocate on behalf of certain classes of clients and against certain interests, and perhaps even to drive him out of the Commonwealth of the Northern Mariana Islands where some obviously regard him as too dangerous to their own personal political and economic interests.

    It is also an extraordinarily careless and sloppy bit of work, undertaken within an astonishing disregard for applicable rules and law and an apparent belief that the fundamentals of

-1-

due process of law can be subverted with impunity given sufficient subterfuge and deception dressed up with savoir faire. Prosecuting Counsel began this case insisting that Murugesan Subbaiah's surname was Murugesan, despite having a copy of the *pro se* complaint in the civil action where everything started, which clearly gives the plaintiff's name as Murugesan Subbaiah.[1] *See* Hearing Exhibit 1. Then, in his "Disposition Memorandum," Prosecuting counsel erroneously refers to the complaining client as "Mr. Sabaiah." Moreover, on the very first page of the memorandum, Prosecuting Counsel makes flagrant misrepresentations of the facts and the record. He states that Respondent "took payment from Mr. Sabaiah [sic]" after agreeing to handle his appeal, ECF No. 46 at 1, when the hearing record is clear from both Respondent's testimony and that of Mr. Subbaiah, that Respondent received no payment from Mr. Subbaiah in connection with the appeal.

Prosecuting counsel also asserts, "Mr. Sabbaiah [sic] never had his day in court, *id.*, intimating that this was a consequence of Respondent's neglect. Except that the assertion is FALSE. As is plain in the hearing record, Mr. Subbaiah most certainly did have "his day in court" – before Judge Munson on the summary judgment motion. Although Judge Munson granted summary judgment against Mr. Subbaiah, he also told him explicitly that he would revisit the summary judgment if Mr. Subbaiah were to obtain counsel to represent him in the district court – information Mr. Subbaiah neglected to communicate to Respondent and which was highly material to the question of the necessity and appropriateness of an appeal.[2]

Prosecuting Counsel next proclaims that "[t]he question that now arises is whether Woodruff has failed other clients by failing to meet the professional standards of conduct or

---

[1] The caption contained a typographical error in which "Subbaiah" was written "Sabbaiah."

[2] Mr. Subbaiah indeed "did not have his day in [*appellate*] court," but this assertion begs the question. The question is whether he needed to be in appellate court; he obviously did not, a fact of which Respondent became aware only after the transcript was prepared.

-2-

whether this is the only incident of misconduct in his past." ECF No. 46 at 1-2. This is a gross misrepresentation of the procedural posture of the case and belies the claim in the caption of his memorandum that it discusses "factors in aggravation." It is in reality a bald-faced attempt to convert Prosecuting Counsel's "simple" Complaint for Ethical Violations into a much more serious charge of a pattern of misconduct warranting disbarment while evading the clear and convincing evidence burden of proving misconduct.[3]

Prosecuting Counsel's improper purpose is pretty much confirmed by his very next sentence, in which he maintains, sanctimoniously, that "investigation of incidents involving Woodruff is a daunting task." ECF No. 46 at 2. The truth is that the investigation of allegations of misconduct required by the local disciplinary rules (and by CNMI disciplinary rules) is precisely what Prosecuting Counsel studiously avoids by attempting to sneak his specious and misleading allegations about Respondent in through the backdoor under the guise of "factors in aggravation." The real "daunting task" for Prosecuting Counsel (and those with whom he has acted in concert in this endeavor) has been the collection, from Respondent's vigorous and active practice producing solid results for a very large number of clients, of every fragment that potentially could be used to portray him in a false light as a careless, irresponsible, and ineffective lawyer.

Prosecuting Counsel's memorandum contains many, many false representations of fact. See, e.g., ECF No. 46 at 2-3. Certainly, these are representations are not supported by any competent evidence. Prosecuting Counsel knows – or should know – that certain of his allegations have been rebutted, corrected, explained, or otherwise qualified by declarations

---

[3] That Prosecuting Counsel's "evidence" fails to establish such a pattern is beside the point. The attempt to prove one "crime" and induce the Judicial Panel to sentence for another is in and of itself fundamentally improper and incompatible with due process of law. It is also an act of deception, as it has now become clear that Prosecuting Counsel has willfully misled both Respondent and the Court from the inception of prosecution to this point regarding his true purposes and intention in the prosecution of this case.

executed by the complaining parties. Prosecuting Counsel's most blatant lie is his assertion, "In at least three cases, Woodruff did not just evade his client, but told the client he had filed an appeal when, in fact, he had no done so." *Id.* at 3. This is an absolutely false statement. It never happened, and there is no competent evidence that it ever did – no testimony, no declaration, no judicial finding of fact.

In the very next paragraph, Prosecuting Counsel repeats the lie that Respondent was paid to do the appeal to the Ninth Circuit, *see id.*. and then compounds the lie with the insistence that Respondent was obligated to take advantage of the Ninth Circuit's willingness to reinstate the case upon filing of the delinquent brief together with an appropriate motion *after Respondent had been constructively discharged by Mr. Subbaiah and the Ninth Circuit had recognized that discharge*. Due to Mr. Subbaiah's actions, Respondent had no such obligation and was dealing with an unpredictable client, who was taking irregular actions in secret from Respondent, and who was neither heeding Respondent's advice nor cooperating with Respondent.

Prosecuting Counsel moves on to admit: "Attorneys make errors. But, when they do, they admit their errors instead of hiding from them, and they try to cure them. Because, in the end, clients come to an attorney seeking help - and, once an attorney takes on matter. he or she has committed to provide that help." *Id.* at 3-4. Here, Prosecuting Counsel is absolutely correct. But what Prosecuting Counsel refuses to recognize or admit, is that is precisely what Respondent does. Indeed, Respondent does more than that. Respondent has many times assisted a client even though the client has previously wronged him, and Respondent has consistently – so far as possible – done everything he can to help a client even after his or her cause has been adjudicated and lost, or Respondent has lost the ability to continue to represent the client.[4]

---

[4] Respondent would point out that this applies even with respect to Mr. Subbaiah. During a break in the merits hearing on May 23, 2016, Respondent walked over to where Mr. Subbaiah, who had studiously been avoiding looking at Respondent, was sitting. Mr. Subbaiah looked up and said, "Sorry, sir." Respondent replied, "Well, there is fault on both

-4-

This is why Respondent had so many clients, and why so many of Respondent's former clients remain fiercely loyal to him despite all the defamatory statements that have been published about him in the past three years. A small minority of Respondent's clients complained before the public defamation began. Many of those complaints – Warfle, Baing, Cambronero, Feliciano, Lee, Ellis, Qun Yu, Kim, even Reyes, were entirely or almost entirely without merit – another, Garde, was minor. Cambronero and Feliciano sued Respondent in the Commonwealth Superior Court, and their complaints were tried before Judge Inos and resulted in judgments in Respondent's favor. Lee and Ellis executed declarations supporting Respondent against the disciplinary charges. Ms. Garde told Respondent's secretary that she was completely satisfied once she received her, admittedly too long delayed, divorce decree and did not agree with the disciplinary action against Respondent. Disciplinary Counsel in the Superior Court admitted that he had never spoken with Kim.

Certain of these complaints were processed in noncompliance or violation of the rules governing the CNMI Bar Disciplinary Committee. Prosecuting Counsel, however, brings forth in his memorandum a good deal more than just the familiar old charges. It is easy to accuse, much more difficult to defend. It is a so much larger task to bring forth the truth. There are complaints here that Respondent never knew existed, that appear to have been advanced for ulterior purposes of former clients, and that in at least some instances appear to be chock full of total fabrications. Even with Prosecuting Counsel's strained efforts to aggregate a mountain of supposedly derogatory evidence, everything he has collected reflects only a tiny fraction of the matters Respondent has handled – and most of, as presented by Prosecuting Counsel, conveys an unfair or inaccurate impression.

---

sides," patted Mr. Subbaiah on the shoulder, and returned to his seat. Later, Respondent spoke with Mr. Subbaiah several times, always treating him with consideration and solicitude.

Prosecuting Counsel's Disposition Memorandum contains 327 pages of documents purported to support Prosecuting Counsel's arguments. Many of these documents Respondent has never seen before the prosecution of this case. Respondent objects to acceptance of any of these documents as evidence of matters asserted therein and demands to be heard in detail as to any evidence the Judicial Panel may consider receiving.

## A.    The Reality of Respondent's Practice

Respondent has over 40 years of commitment to the people of the CNMI.[5] Respondent first arrived in the Northern Mariana Islands on June 30, 1974, as a Peace Corps Volunteer. Respondent spent the next two years as a "Commissioner's Assistant" in Susupe Village doing community development work, advising youth groups, organizing basketball leagues (including the first ever women's league in the Mariana Islands District), preserving public land for a beach park and organizing the initial clearing, and teaching English at Mt. Carmel School. After his Peace Corps service, Respondent worked for several months helping manage an import, wholesale, and retail business, before returning to the U.S. mainland for the holidays.

After the New Year, Respondent returned to the Marianas and worked as a proofreader for the Congress of Micronesia for their final session on Saipan before the separation of the Northern Mariana Islands from the rest of Micronesia. After the conclusion of the Congress of Micronesia session, Respondent secured employment with the Continental Hotel as Food & Beverage Controller (the accounting side of food and beverage operations) and spent the next five years in the hotel industry. Respondent eventually became Purchasing Manager for the hotel, a position he held during the transition from Continental to Hyatt and for more than two years after.

---

[5] To be clear, "the people of the CNMI" refers to all those who make the CNMI their home, despite the inclination of some in the community to diminish certain classes of residents to the status of houseguests.

-6-

In 1982, Respondent left the hotel business and became an entrepreneur. During the next nine years, he engaged in business, economic, and political consulting; ran a demonstration public bus system; operated a beachfront bar and restaurant; and taught computer courses at Northern Marianas College. In 1985, he served as Chief Consultant to the Second Northern Marianas Constitutional Convention, which proposed 44 amendments to the Constitution, all of which were subsequently ratified by the voters. In 1991, Respondent departed the CNMI for Hawai'i, where he studied law for the next three years at the William S. Richardson School of Law of the University of Hawai'i at Manoa.

Following law school, Respondent returned to the CNMI to serve as Senate Legal Counsel, a position he held for six years during the Ninth, Tenth, Eleventh and Twelfth Legislatures. Prior to Respondent's arrival back on Saipan in 1994, the incumbent Senate President had been removed and another Senator installed as Senate President by action of a majority of the members of the Senate. Notorious CNMI attorney Ted Mitchell had then filed suit in the Commonwealth Superior Court on behalf of the deposed Senate President against the governor, the five senators involved in the leadership coup, and the Ninth Northern Marianas Commonwealth Legislature. The suit challenged not only the action of deposing the Senate President but also the apportionment of the Senate with equal representation of the islands of Saipan, Tinian, and Rota despite their vastly differing populations. The Commonwealth Superior Court ruled on the merits and dismissed the action on July 18, 1994.[6] Appeal to the Commonwealth Supreme Court was taken on August 24, 1994.

This was the posture of the case when Respondent was admitted to practice as a government attorney on November 28, 1994. Thus, Respondent's initiation into the practice of law in the CNMI included joining the team of attorneys defending the apportionment of the

---

[6] Plaintiff moved for reconsideration, which was denied on August 22, 1994.

-7-

Commonwealth Senate and the independence of the Commonwealth Legislature as a co-equal branch of government on appeal. Appellees' position was vindicated on April 18, 1996, when the Commonwealth Supreme Court affirmed the Superior Court's dismissal of the suit. *Sablan v. Tenorio*, 4 N.M.I. 351 (1996).

Mr. Mitchell was not done, however. In 1997, he filed another lawsuit challenging the apportionment of the Commonwealth Senate, this time in Federal court and on behalf of different plaintiffs. Respondent represented the Commonwealth Legislature in that action. A three-judge court was convened on Respondent's notice. On May 5, 1999, the three-judge court granted summary judgment to defendants and defendant-intervenors. Appeal as of right was taken to the U.S. Supreme Court. Appellees moved for summary affirmance, which motion was granted by the U.S. Supreme Court on January 18, 2000. *Rayphand v. Sablan*, 95 F. Supp. 2d 1133 (D. Nor. Mar. I. 1999), *summarily affirmed sub nom. Torres v. Sablan*, 528 U.S. 1110, 120 S. Ct. 928 (2000).

In 1995, a third constitutional convention was held. The convention produced a complete rewrite of the Commonwealth Constitution, which it presented to the voters in the form of nine proposed amendments.[7] During the subsequent campaign, pro and con, Respondent led the opposition to the proposed amendments, producing a series of 20 daily newspaper columns in early 1996 critiquing the work of the 1995 Convention. Commonwealth voters rejected all nine proposed amendments.

After Larry Hillblom disappeared in a plane crash and was presumed dead in 1995, what has been called the "World Cup of Probate" commenced in Commonwealth courts. In the competition over Larry's fortune, legislation to change the rules of intestate succession was introduced – and passed – by the Commonwealth Legislature in 1996 in an attempt to prevent

---

[7] Respondent was not involved in the work of the Convention.

children claiming as pretermitted heirs of Hillblom from taking any part of the estate. Respondent, together with House legal counsel and other lawyers, believed this legislation, which became known as the Hillblom bill, to be unconstitutional, depriving claimants of vested property rights without due process of law. Respondent's role relative to opposing this unconstitutional action is the subject of Chapter 45 of James Scurlock's book, "King Larry."

Respondent's transition to the private practice of law began in 2000 when the chairman of the board of directors of the Commonwealth Utilities Corporation (CUC) asked him to assist in negotiations with Enron Corporation for a new power plant for Saipan.[8] Initially, Respondent utilized his accrued annual leave from his Legislative Bureau employment to undertake this representation but ultimately transitioned full time to private practice beginning October 1, 2000. Respondent's representation of CUC continued through the first quarter of 2001.

From April through September of 2002, Respondent was retained by the Marianas Public Land Trust, together with two of his former law professors at the William S. Richardson School of law at the University of Hawai'i at Manoa, Jon Van Dyke and Randall Roth, to assist in the development of a Master Trust Document to guide the trustees in the execution of desired socially conscious targeted investment strategies consistent with their fiduciary duties.

In July of 2002, Respondent was retained to serve as counsel to the Mayor of Saipan. Respondent's responsibilities in that capacity included defense of the Mayor of Saipan in connection with the fireworks incident at the 2007 Liberation Day Festival, *Reyes v. Sunleader Co., Ltd. Saipan, Saipan Mayor's Office, et al.*, Civil Action No. 07-0366 (Nor. Mar. I. Super. Ct.). Respondent's general representation of the Office of the Mayor ended at the end of Fiscal

---

[8] It is to be noted that Prosecuting Counsel, Rexford C. Kosack, and Steven P. Pixley, counsel for the defendant in the Subbaiah matter, represented unsuccessful competing bidders for the power plant project.

Year 2007,[9] although Respondent continued to represent the mayor in the fireworks case to its conclusion.  Respondent is still owed a total of $37,175 for services rendered to the Mayor of Saipan but never paid.

In 2004, Respondent agreed to undertake the representation of the Dekada Movement, an organization seeking improved immigration status for long-term alien residents of the CNMI.  Respondent's vigorous advocacy on behalf of the interests of foreign nationals in the CNMI over the next nine years was unpopular in certain quarters of the CNMI community and especially with certain powerful political and economic interests.  Respondent's ability to engage in such advocacy was to a large extent, however, brought to a grinding halt in the first month of 2013, by the blitzkrieg interim suspension action against him.

On May 8, 2008, President Bush signed into law the Consolidated Natural Resources Act of 2008 ("CNRA"), Pub. L. 110-229.  Subtitle A of Title VII of the CNRA, 122 Stat. 853-67, provided for a transition to U.S. immigration law in the CNMI.  The transition began effective November 28, 2009.  During the run up to this date, Respondent was called upon to assist, and did effectively assist, a very large number of aliens resident in the CNMI to establish and document their lawful immigration status under the immigration laws of the Commonwealth and thus secure lawful status for the first two years of the transition.

At this time, Respondent was already the leading immigration lawyer in the CNMI representing and defending aliens under local law.  When the Saipan Immigration Court opened, Respondent was the first member of the CNMI Bar to enter an appearance in that court.  At the time of Respondent's "interim" suspension on February 1, 2016, Respondent represented far and

---

[9]  A contract renewal was processed but apparently blocked at a higher level of the government.  Respondent was replaced as general counsel to the mayor by an attorney with powerful political connections at the highest levels of the CNMI Government.  Respondent's ouster as counsel for the Mayor of Saipan very likely was at least in part in retaliation for his vigorous advocacy on behalf of foreign workers in the CNMI beginning in 2004.

away more clients in the Saipan Immigration Court than any other attorney – probably, in fact, more than all other CNMI lawyers handling removal cases *combined*.  When the Board of Immigration Appeals, acting pursuant to the mandate of a strict regulation requiring summary suspension upon receipt of a certified copy of a state court suspension from practice, including an interim suspension, suspended Respondent effective March 20, 2013, the effect on availability of counsel for aliens in the CNMI facing removal was profound.

Respondent, on April 6, 2012, entered his appearance on behalf of the putative class representative in the class action lawsuit in this court against the Commonwealth government to secure payment by the Commonwealth government of its obligations to CNMI Government retirees. *See Johnson v. Fitial*.[10] Civil Action No. 09-00023 (D. Nor. Mar. I.).  Acceptance of this representation was sure to spark the ire and probable wrath of top CNMI Government officials who had, for years, been evading the government's obligations to the Retirement Fund in favor of utilizing the money for other purposes.  Less than a year later, Respondent was hit with the unprecedented and highly irregular interim suspension action in the Commonwealth Supreme Court, which in the space of less than a month imposed an *immediate* suspension from the practice of law on Respondent.  Fortunately, due to the independence of the federal judiciary from that of the CNMI, apparently unanticipated by, and likely to the considerable chagrin of, the instigators and proponents of the interim suspension action, Respondent was able to carry on successfully this and other important federal matters despite the dubious actions of the CNMI Disciplinary Committee and Commonwealth courts against him.

Respondent was served with the Commonwealth Supreme Court's Order to Show Cause in the interim suspension proceeding on January 4, 2013, as he was leaving the courthouse with his clients in a contested adoption case in which the opposing party was a politically well-

---

[10] Originally, *Roe v. Commonwealth of the Northern Mariana Islands*.

connected local woman represented by Stephen J. Nutting, Esq.,[11] and in which Respondent and his clients, expatriate Caucasians from the U.S. mainland, were prevailing. After Respondent was knocked out of the case by the interim suspension order, his clients retained Colin Thompson, Esq. to continue the representation. Appearing at a motion or evidentiary hearing later, Mr. Thompson told Mr. Nutting, "It looks like I am here to snatch defeat from the jaws of victory." Frustrated with the turn of events, Respondent's former clients ultimately abandoned the intended adoption and returned the two-year old child – who had been with them for more than a year – to the natural mother.

In the course of the interim suspension proceedings, Respondent submitted a copy of his calendar to show the Court both why the time it allowed him to respond to the order to show cause was unreasonably short and how abrupt suspension from practice could prejudice his clients. That calendar showed that Respondent had hearings and appointments scheduled almost every weekday in January in 35 distinct matters. The calendar also showed 13 hearings in the Saipan Immigration Court scheduled for February and six more in March. At the time of Respondent's immediate suspension on February 1, 2013, Respondent had 95 active clients, all of which ultimately were adversely affected by loss of Respondent's representation. Many of these had been represented on a reduced fee or no fee *pro bono publico* basis.

Through more than a dozen years of private practice, Respondent never advertised, yet he had a very busy and active practice, with a very large number of individual clients. Clients come to an attorney for a reason, and in Respondent's case, it was due to the character and nature of his practice and his skill in achieving the results his clients sought. It was a result of his

---

[11] Mr. Nutting is a former law partner of Bruce Mailman, who is and was then a member of the Disciplinary Committee of the CNMI Bar Association, and who is demonstrably possessed of clear bias, prejudice, and conflict of interest adverse to Respondent. Mr. Mailman and his wife, Maya Kara, are also extremely close personal friends with Prosecuting Counsel, Rexford C. Kosack, Esq.

accessibility and affordability and his willingness to give his time to answer questions and explain matters clearly without payment for every tenth of an hour consumed. It was because of his competence and dedication to his clients. It was because of his willingness to serve clients and take on causes most other lawyers on the island would reject. Respondent made justice accessible to countless individuals for whom representation and support in dealing with life crises otherwise would have been nothing more than a faint hope and unfulfilled dream.

**B. Prosecuting Counsel's Specious Timelines**

Prosecuting Counsel has included with his "Disposition Memorandum" two timelines, each populated with colorful balloons designed to create a vivid visual representation of alleged misconduct by, and purported disciplinary actions taken against, Respondent. These timelines, unfortunately, are not designed to help the Judicial Panel understand the facts, or to fairly present the truth. To the contrary, they are skillfully tailored to achieve precisely the opposite – to portray Respondent in the most negative light possible, to cherry pick (rotten cherries), exaggerate and distort, with a single-minded aim of making Respondent, a highly competent attorney dedicated to the most noble purposes of the law, appear, through slur and innuendo and selective scrutiny and hearsay and distortion, to be grossly incompetent, irresponsible, callous, negligent, insensitive, incorrigible, lazy and slothful, and thus unfit to practice law. In conjuring up this chimera, Prosecuting Counsel violates his ethical duties as a prosecutor and does a disservice to bench, bar, and the public.

One timeline (the shorter one) is limited to elements of the disciplinary proceedings against Respondent in Commonwealth courts. Of course, as Respondent has pointed out several times already, anything within the scope of the proceedings in the Commonwealth courts has no appropriate place in this case. Those claims all fall within the scope of the reciprocal discipline case, Miscellaneous Case No. 13-0004. Inclusion of elements of post-judgment proceedings in Commonwealth courts is even more inappropriate, not only because such elements are bound up

with the case itself (thus being inextricably bound to the scope of review involved in the reciprocal discipline case), but because such matters also raise jurisdictional questions, were or are disputed, may not have been just, and may not be presently final. Prosecuting Counsel's eighteen colorful balloons on this timeline are utterly irrelevant to this case because they constitute nothing more than an attempt to end run the due process guarantees of the reciprocal discipline case, threaten conflicting results between this case and that case, and treat unreviewed case-specific post-judgment proceedings as if they were independent disciplinary proceedings or instances of misconduct.

Prosecuting Counsel's second timeline contains approximately 68 of his colorful incendiary balloons. This timeline suffers all of the same faults as the first timeline – and then some. It includes much of the same material as the first timeline, and thus is subject to the same objections. It goes further, however, to include matters that never gave rise to a client complaint, matters that cannot properly be labeled "disciplinary actions," and complaints allegedly made to the Disciplinary Committee of the CNMI Bar Association of which Respondent has never received the notice required by the CNMI Disciplinary Rules and disclosure of which outside the CNMI Bar Disciplinary Committee is strictly prohibited by relevant rules. Prosecuting Counsel apparently recognizes no boundaries in his misplaced zeal to cast Respondent in a false light.

**C. Prosecuting Counsel Presents Little or No Competent Evidence**

Prosecuting Counsel likely will respond to objections to the competency of his "evidence" by pointing out that the evidence rules do not apply in disciplinary proceedings in this Court. That is true, but beside the point. The local disciplinary rules require *reliable* evidence, and the best tests of reliability are those articulated in the rules of evidence. So the Judicial Panel has some latitude but not license to ignore the evidence rules altogether. The temptation to accept evidence outside normal evidentiary standards should be very narrowly circumscribed. Moreover, the actual relevance and significance of the evidence offered should

be carefully considered.  A court order by itself is only evidence that the court said what is contained in the order, at the time it was issued.  It is not evidence that the judge was correct or the language warranted.  He or she could have been in error as to the law, or misunderstood the facts, influenced by bias or prejudice, or just having a bad day.

### D. Respondent is Entitled to a Meaningful Opportunity to Respond to Any of Prosecuting Counsel's Evidence the Judicial Panel is Inclined to Accept

It is impossible for Respondent to adequately respond to Prosecuting Counsel's scattergun tactics in the space of a mere two weeks.  In many instances, a full and complete response demands that Respondent dig out the old case file and maybe even contact the client.  Respondent needs to prepare a detailed response and marshal evidentiary support rebutting Prosecuting Counsel's innuendo and superficialities and unsubstantiated allegations and complaints.

Some of Prosecuting Counsel's "evidence" relates to proceedings in Commonwealth courts and actions taken in those courts.  Careful examination of those proceedings, including review of transcripts, would reveal those actions and proceedings to be unjust.  Moreover, Prosecuting Counsel misrepresents the character of certain actions and proceedings in those courts.  Accordingly, the Judicial Panel needs to provide Respondent an additional 90 days to prepare a full response if it is inclined to accept any of Prosecuting Counsel's evidence.[12]

---

[12] This extended period of time is necessary because transcripts will need to be prepared and because Respondent has other obligations and matters he is required to address in the remainder of June and throughout the month of July, meaning he will be unable to give this matter the necessary attention until the first of August.

-15-

**E. The Standards for Discipline**

Under the ABA Model Rules for Disciplinary Enforcement,[13] eight possible sanctions are outlined. These range from the most severe – disbarment – to suspension (not in excess of three years), probation (not in excess of two years but potentially renewable for an additional two years), reprimand, admonition, financial remedies (where appropriate), assessment of costs, and limitation on the nature or extent of the respondent's future practice. Model R. Discip. Enf. 10(1). The model rules specify four factors to be considered in imposing sanctions:

> (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system, or to the profession;
>
> (2) whether the lawyer acted intentionally, knowingly, or negligently;
>
> (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and
>
> (4) the existence of any aggravating or mitigating factors.

*Id.* 10(3). According to the commentary:

> Probation is the appropriate sanction when the respondent can perform legal services but has problems that require supervision. Probation should be used only in those cases where there is little likelihood that the respondent will harm the public during the period of rehabilitation and the conditions of probation can be adequately supervised.

*Id.* Commentary.

The Rule 10 Commentary of the ABA Model Rules for Disciplinary Enforcement also references Standard 9 of the ABA Standards for Imposing Lawyer Sanctions. Under Standard 9:

> Aggravating factors include: prior disciplinary offenses; dishonest or selfish motive; a pattern of misconduct; multiple offenses; bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; submission of false evidence, false statements or other deceptive practices during disciplinary process; refusal to acknowledge wrongful

---

[13] Internet available at http://www.americanbar.org/groups/professional_responsibility/resources/lawyer_ethics_regulation/model_rules_for_lawyer_disciplinary_enforcement.html.

nature of conduct; vulnerability of victim; substantial experience in the practice of law; and indifference to making restitution.

Mitigating factors include: absence of prior disciplinary record, absence of dishonest or selfish motive; personal or emotional problems; timely good faith effort to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and remoteness of prior offenses.

*Id.* The Commentary continues:

The Standards for Imposing Lawyer Sanctions set forth a comprehensive system for determining sanctions, permitting flexibility and creativity in assigning sanctions in particular cases of lawyer misconduct. Use of the Standards will help achieve the degree of consistency in the imposition of lawyer discipline necessary for fairness to the public and the bar.

*Id.*

## F.  Prosecuting Counsel's Alleged Aggravating Factors

Although Respondent was disbarred in Commonwealth courts, that disciplinary action was purely on the basis of a technical default and without any presentation of evidence or proof. It cannot serve as a basis for disciplinary action in this court absent the review required by the U.S. Supreme Court. *See Selling v. Radford*, 243 U.S. 46, 50 (1917); *In re Kramer*, 282 F.3d 721, 724 (9th Cir. 2002) (citing *Selling*, 243 U.S. at 50–51). That, precisely, is the point of the reciprocal discipline case, Miscellaneous Case No. 13-0004. Despite Prosecuting Counsel's attempt to style monetary sanctions imposed in exercise of the court's inherent power to manage its business, or dismissals pursuant to applicable court rules or the discretion of the court, and judicial admonitions (warranted or not) as disciplinary actions, the suggestion is contrary to law. For purposes of this case, Respondent has no cognizable prior disciplinary offense.

Prosecuting Counsel also argues that Respondent is guilty of a pattern of misconduct. Respondent disputes this claim and further challenges the "evidence" Prosecuting Counsel has offered in support of this argument. Much of it is not relevant to the point he seeks to prove,

-17-

some of it is exaggeration, some is distorted, and some of it is false or just plain wrong. Some of it must be excluded because it was obtained and produced in this Court in violation of the rules governing the Disciplinary Committee of the CNMI Bar Association, and because Respondent was never given notice of the complaint, and the matter never investigated, as required by those rules. While it is not possible to address and rebut Prosecuting Counsel's "evidence" in this response on just two weeks notice, due process requires that Respondent be afforded a meaningful opportunity to do so as to any evidence the Judicial Panel is willing to consider.

**G. Consideration of Mitigating Factors**

The following mitigating factors all are present in this case:

- absence of prior disciplinary record

- absence of dishonest or selfish motive

- personal or emotional problems (for 18 years, until late 2013, Respondent was a victim of domestic abuse and violence)

- full and free disclosure to investigating attorney board and cooperative attitude toward proceedings

- Respondent's character and reputation in the community

- delay in disciplinary proceedings

- interim rehabilitation

- remorse

- remoteness of prior offenses.

**IV.**

**CONCLUSION**

For the foregoing reasons, the Judicial Panel should strike and disregard Prosecuting Counsel's "Disposition Memorandum" in its entirety. If the memorandum and Prosecuting

Counsel's evidence are to be considered, Chief Judge Ramona V. Manglona and Superior Court Presiding Judge Robert C. Naraja must recuse themselves from this matter. This will also require that a mistrial be declared and that the charges in the Complaint for Ethical Violations be reheard before a newly constituted Judicial Panel.

Disciplinary sanctions must be based on charged conduct proven by clear and convincing evidence with appropriate adjustments for aggravating and mitigating factors. It is not permissible or consistent with due process of law to utilize purported "factors in aggravation" – especially such factors propounded without a full adversarial evidentiary hearing – to transform misconduct charged and proven into a wholly different class of misconduct, and then impose discipline based principally on the so-called "factors in aggravation" rather than the originally charged conduct.

The most severe discipline that reasonably could be imposed based on the misconduct proven at the merits hearing, even given consideration of aggravating and mitigating factors, is a one-year suspension from practice. Respondent currently has only one case pending in this Court. Any suspension from practice or more severe discipline imposed should be expressly qualified to except that case and allow Respondent to prosecute it to completion.[14] However, Respondent believes a more appropriate discipline under the circumstances of this case, and in view of the totality of the circumstances, including any potentially aggravating and mitigating factors, is a term of probation.

---

[14] That case is *Ramsey v. Muna*, Civil Action No. 14-00021, from which Chief Judge Manglona has already recused herself.

Dated this 14th day of June, 2016.

Respectfully submitted,

STEPHEN C. WOODRUFF
Respondent