FILED
Clerk
District Court

JUN 14 2016

for the Northern Mariana Islands
By________________
(Deputy Clerk)

Stephen C. Woodruff
Attorney and Counselor at Law
P. O. Box 500770
Saipan, MP 96950
Tel.: +1 (670) 989-2797
Fax: +1 (808) 356-1349
Email: scwlaw.spn@gmail.com

*In Pro Per*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| **IN RE STEPHEN C. WOODRUFF,**<br><br>**Respondent.** | **Case No. 1:13-MC-00061** |

# RESPONDENT'S EXHIBITS

## VOLUME 2

Stephen C. Woodruff
Attorney and Counselor at Law
P. O. Box 500770
Saipan, MP 96950
Tel.: +1 (670) 989-2797
Fax: +1 (808) 356-1349
Email: scwlaw.spn@gmail.com

*In Pro Per*

FILED
Clerk
District Court
JUN 14 2016
for the Northern Mariana Islands
By________
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

**IN RE STEPHEN C. WOODRUFF,**

**Respondent.**

**Case No. 1:13-MC-00061**

# RESPONDENT'S EXHIBITS

**VOLUME 2**

VOLUME 2 INDEX


| No. | Document | Bates Number |
| --- | --- | --- |
| 1. | Declaration of Esperanza Ellis | 001 |
| 2. | Transcript of Hearing (Nor. Mar. I. Super. Ct. March 14, 2013) | 008 |
| 3. | Declaration of Jihyun Lee | 018 |
| 4. | Transcript of Hearing (Nor. Mar. I. Super. Ct. May 15, 2013) | 033 |

FILED
DATE 3/14/13 TIME 10:45am
BY Kb

**IN THE SUPERIOR COURT**
**OF THE**
**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| **IN RE THE MATTER OF:**<br><br>**STEPHEN C. WOODRUFF,**<br><br>**Respondent.** | **Civil Action No. 13-0017**<br>**Disciplinary Cases**<br>**1) 2008-008; 2) 2008-12; 3) 2009-001; 4) 2009-005; 5) 2011-012; 6) 2011-013; 7) 2011-014; 8) 2012-001; 9) 2012-004**<br><br>**DECLARATION OF ESPERANZA ELLIS** |

I, Esperanza Ellis, declare and state, under penalty of perjury, as follows:

1. Stephen C. Woodruff has been my attorney since 2008. He has been of tremendous assistance to me through all the years he has represented me and, in fact, is the only attorney who has ever really helped me and is the only person I can always count on to help. Even though he is a very busy lawyer because he works to help so many people (for fees they can afford and few, if any, other lawyers would accept), he still would do his best to help when I need it and take time to explain things to me. Sometimes, understandably, he just would not have the time because of other appointments and the pressure to meet deadlines and prepare documents.

2. I completely disagree with the interim suspension imposed on Mr. Woodruff by the Commonwealth Supreme Court and am angered by the actions of Timothy Bellas, Esq. and the CNMI Bar Disciplinary Committee.

3. Mr. Woodruff has shown me a copy of the First Amended Complaint ("FAC") in the above-captioned matter, of which Disciplinary Case No. 2011-014 (paragraphs 67 through 85) relates to a complaint I purportedly filed against Mr. Woodruff. I did meet with Mr. Bellas in his capacity as chairman of the CNMI Bar Disciplinary Committee on November 15, 2011 and January 27, 2012, but I never had an intention or desire to have Mr. Woodruff suspended from the practice of law or otherwise disciplined as a lawyer. My main concern at the time was the stress I had because my umbrella permit was expiring on November 27, 2011, and my employer was pressuring me to produce an Employment Authorization Document ("EAD") or lose my job which I badly needed to support myself and my daughter. I also was misled by Officer Luntsford of USCIS to think that complaining to Mr. Bellas about Mr. Woodruff would help me get my EAD.

4. In point of fact, my EAD was approved on April 17, 2012 through Mr. Woodruff's work and for no other reason. This year I renewed my EAD with Mr. Woodruff's help (the application was submitted December 16, 2011 and officially received by USCIS on January 24, 2013). I received my new EAD, valid from April 17, 2013 through April 16, 2014, today, at Mr. Woodruff's office.

5. I never told Mr. Woodruff about my meetings with Mr. Bellas until January of this year when Mr. Bellas started trying to get me to agree to come testify against Mr. Woodruff in a court hearing. I refused.

6. At the time, I was facing a personal crisis and needed Mr. Woodruff's help again. He had already agreed and started to help when I told him about my involvement with Mr. Bellas. Mr. Woodruff informed me that he had recently learned about the matter because of something Mr. Bellas filed against him in the Commonwealth Supreme Court. He was very gracious and told me he understood how it came about, what I was going through at the time. He also told me that the Disciplinary Committee had never before told him about my "complaint" or given him

any chance to respond. He proceeded over the next several days to help me with my serious personal crisis – without charge, on a purely complimentary basis – and effectively saved me, at least for now, from a potentially disastrous situation. Had the Commonwealth Supreme Court order of interim suspension come earlier, preventing Mr. Woodruff from helping me, I very likely could have suffered irreparable harm on account of that order.

7. Paragraphs 67 through 69 of the FAC seriously misrepresent the facts of Mr. Woodruff's 2008 representation of me. Paragraph 68 of the FAC is absolutely false. Mr. Woodruff processed my immediate relative entry permit precisely as he agreed to do. The difficulty in my case was my abusive husband had abandoned me and my application had to be processed without his signature. Paragraph 69 is also untrue. My immediate relative entry permit was finally released by CNMI immigration because of Mr. Woodruff's efforts, and I did not pay the fee myself.

8. The remaining allegations of the FAC attributed to my "complaint" are equally erroneous, misleading, or downright false. Regarding paragraph 70 of the FAC, Mr. Woodruff did not tell me that $900 was for fees and the balance of the $3,000 was for costs." Mr. Bellas apparently misunderstood me. The $3,000 was a flat fee that Mr. Woodruff agreed would cover both his fees and any costs involved in both the paternity case and processing the "green card" application (other than medical exam costs). I think this was an extremely reasonable fee for the work Mr. Woodruff agreed to take on.

9. Mr. Woodruff also did not tell me that processing of "the resident alien application would take three months." I know that three months is generally the <u>fastest</u> an ordinary green card application for an immediate relative of a U.S. citizen takes to be processed by USCIS if there are no requests for evidence, questions, or other issues. My application was based on the Violence Against Women Act ("VAWA") and was not supported by any court order or police report demonstrating abuse. I know that VAWA applications generally take well over a year to

be processed by USCIS. There also was a question at that time about whether an application for adjustment of status could accompany the petition or had to await approval of the petition.

10. There never was a need to file a paternity action because the Commonwealth Attorney General's Office had already filed FCD UR Civil Action No. 07-0653 seeking to obtain child support from my husband, who is a merchant marine working the pre-position ships. On or about August 26, 2009, the very next day after I retained him for the purpose, Mr. Woodruff entered an appearance in that case at my request, seeking to supplement, not replace, the Attorney General's Office as my counsel therein. At the same time, Mr. Woodruff filed a motion requesting an "order directing respondent Edward Ellis herein to appear and submit to DNA testing" and a proposed order for that purpose. At the time I had information indicating that my husband was on one of the ships offshore and we might be able to serve him.

11. Unfortunately, by the time the Family Court issued the requested order several days later, my husband had left the area. The Assistant Attorney General responsible for my child support case against my husband is Tom Schweiger, Esq.. After Mr. Schweiger learned that I had asked Mr. Woodruff to step into the case, he called me into my office and scolded me for doing so. Nevertheless, from 2007 until today, Mr. Schweiger has accomplished nothing in my case. The only progress that I know of that has ever been made in my child support/paternity case was the attempt by Mr. Woodruff to drag my husband in to submit to DNA testing. This is necessary because I was told that my husband is denying paternity (even though he is presumptively the father because the child was born during the marriage). His denial is also ridiculous given that our daughter bears a very strong resemblance to him. To obtain proof that my husband is the father, I paid $450 to the Commonwealth Superior Court on November 19, 2007 for DNA testing. Despite all this, Mr. Schweiger has never gotten any results for me.

12. The physical examination discussed in paragraph 73 of the FAC is required to support an application for adjustment of status. There is nothing unusual or inappropriate about

the facts alleged in that paragraph. This was simply an event in the process of Mr. Woodruff working with me to accomplish my purpose.

13. I do not believe Mr. Woodruff did anything wrong in his handling of my "green card" application. I disagree with paragraphs 75 through 79 of the FAC and do not believe they accurately reflect what I told Mr. Bellas. Paragraph 79 is absolutely false. Mr. Woodruff did give me copies of what he filed and kept me as well informed as he could. While it is true that I made many follow ups with Mr. Woodruff's office, it was never true that these efforts were "ineffective." Even without an appointment (which was almost always), Mr. Woodruff regularly gave me his time, without charge, and answered my questions as best he could. Mr. Woodruff's staff also was always courteous to me on the telephone and also did their best to help. When I faced the threat of losing my job and was stressed out as a result, I in fact made a pest of myself at Mr. Woodruff's office. The time he "threatened to call the police," he was justified in doing so. I had come the day before, and he had told me to come back two days later, but instead I came that day, without an appointment and against his explicit instructions, and was making a pest of myself, insisting on talking with him, disrupting his office, and interfering with his ability to serve his other clients. Mr. Woodruff told me I had to leave, and I just ignored it and kept insisting to talk to him. It was only then that he threatened to call the police. I am glad that he did not do so but instead turned his back on me and returned to his office, choosing to try to ignore me in the outer office.

14. Mr. Woodruff never told me that the application had been mailed to Chicago. As he later explained to me, he mistakenly gave me a postal receipt that was addressed to Chicago that actually was for someone else's regular "green card" application. Mr. Woodruff is an experienced immigration lawyer and would not erroneously send a VAWA application to Chicago when it needs to go to Vermont. It is not clear what happened to my original application. It may have been lost in the mail or misplaced in some USCIS mailroom. In any

case, Mr. Woodruff and I resubmitted the application, and it was processed without a hitch so far. There were multiple requests for evidence that Mr. Woodruff handled. All in all, Mr. Woodruff did a great deal of work to help me with this, and spent many hours total discussing it with me.

15. The bottom line is that I have employment authorization today and a prima facie determination in my favor from the Vermont Service Center on my VAWA lawful permanent resident application. I have this only because of Mr. Woodruff's efforts on my behalf.

16. Regarding paragraph 85 of the FAC, no funds were paid by me to Mr. Woodruff "in trust." I paid an agreed fixed fee to Mr. Woodruff for his services, from which he agreed costs would be covered and his attorney's fee thus reduced by the ultimate actual amount of such costs.

17. Prior to the actions by Mr. Bellas trying to get me to testify against Mr. Woodruff, and Mr. Woodruff advising me that Mr. Bellas was trying to get him suspended from practicing law, it was my understanding that the matter was closed. I had received a letter from Mr. Bellas something like a year or more ago that I understood to say that it was closed, and I was satisfied with that.

18. Mr. Woodruff has drafted the declaration on my behalf, but I have carefully read it and confirm that everything in it is as I understand the truth to be. Mr. Woodruff did not pressure me in any way to prepare this declaration. Neither did he offer me any reward for doing so. I make this declaration of my own free will for the reasons set out above.

I, Esperanza Ellis, declare and state, under penalty of perjury, that this declaration is true and correct, to the best of my recollection and belief, and is based on my personal knowledge, including information regarding my matters provided to me by Mr. Woodruff.

Executed this 13th day of March, 2013, on the island of Saipan, Commonwealth of the Northern Mariana Islands.

ESPERANZA ELLIS

E-FILED
CNMI SUPREME COURT
E-filed: Apr 30 2014 03:50PM
Clerk Review: Apr 30 2014 04:08PM
Filing ID: 55370380
Case No.: 2013-SCC-0030-CIV
Nora Borja

E-FILED
CNMI SUPERIOR COURT
E-filed: Apr 22 2014 10:26AM
Clerk Review: Apr 22 2014 12:41PM
Filing ID: 55331666
Case Number: 13-0017-CV
Kristy Diaz

**IN THE SUPERIOR COURT**
**OF THE**
**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**

| | | |
|---|---|---|
| **IN RE THE MATTER OF:** | ) | **Civil Action No. 13-0017** |
| **STEPHEN C. WOODRUFF,** | ) | **CORRECTED TRANSCRIPT OF PROCEEDINGS**[1] |
| **Respondent.** | ) | HEARING BEFORE JUDGE DAVID A. WISEMAN |
| | ) | March 14, 2013 |

[1] This transcript corrects formatting and stylistic concerns and minor errors in the transcript filed April 16, 2014, after the same were brought to the attention of Respondent-Appellant by Disciplinary Counsel.

# Transcript of Proceedings

## Superior Court of the Commonwealth of the Northern Mariana Islands

## March 14, 2013 Default Hearing

## *In the Matter of Stephen Woodruff*, Civil Action No. 13-0017

**1035**

THE COURT: [Gavel] You may be seated. [Papers shuffling] Uh . . . [Unintelligible] Is the door locked out there? [Unintelligible]

MR. CLIFFORD: I think it's open your Honor, 'cause I just came in.

THE COURT: Alright, my law clerk [Unintelligible] lock it. [Clears throat] Alright, this is a sealed case, In the Matter of Stephen Woodruff. We're here on this 14th day of March, in case number thirteen dash seventeen. We're here for a default judgment.

THE COURT: Mr. Woodruff, I was just handed a package from you?

MR. WOODRUFF: Yes, Your Honor that includes my motion, uh,uh, to set aside the entry of default and, uh, uh, and the supporting documents.

THE COURT: You filed this on the date of the hearing.

MR. WOODRUFF: That's correct, Your Honor I was only aware of the, uh, of this hearing as . . .

THE COURT: Why should you be aware of the hearing if you didn't answer?

MR. WOODRUFF: Well, Your Honor, I emailed Mr. Clifford on the 8th of March regarding this matter. It's in my declaration. I certainly never had any intention . . . I mean these, these are really very spurious, uh, uh, uh, charges that the Disciplinary Committee, in a very irregular . . .

THE COURT: Uh . . . Let's not . . . We're here on a procedure right now. Let's . . .

MR. WOODRUFF: Yes, Your Honor.

THE COURT: Let's not . . .

[Thumping or knocking sound]

THE COURT: Can you check the door? 'Cause [Inaudible]

CLERK: Yes, I just called the marshal.

MR. CLIFFORD: You want me to check? It sounds like there's somebody . . .

THE COURT: [Unintelligible]

[Metallic sounds]

MR. CLIFFORD: It, it's locked now, Your Honor. Shall I just wait for your clerk?

CLERK: She has access. [Unintelligible]

THE COURT: Okay. [Inaudible] Okay, yeah. Leave it, leave it. It's a sealed hearing. The courtroom's locked.

[Unidentified person clearing throat]

MR. WOODRUFF: Uh, uh . . . Under no circumstances, Your Honor, would I I allow these allegations to ... knowing, uh. Under no circumstances, would I knowingly or intentionally allow these allegations to, uh, be unanswered. Uh, they are substantially without . . .

THE COURT: Mr. Woodruff. [Inaudible]

MR. WOODRUFF: Okay, I responded in the Supreme Court, Your Honor.

THE COURT: You responded the day of the hearing.

MR. WOODRUFF: I wouldn't ignore it here.

THE COURT: The day of the hearing you gave me what you say is a motion, five minutes before the hearing. I see the caption, what you say is a motion to vacate the default, based on the fact that you believe [unintelligible] appearance in this case.

MR. WOODRUFF: No.

MR. CLIFFORD: May I be heard, Your Honor? I brought those emails and was gonna make the . . .

Mr. Woodruff did send me an email, uh, near the close of business. I think it was 4:43 p.m. on Friday, March 8. Uh, you know, my general practice ... I guess, to take a step back, is with default, my general practice, is . . . There's no obligation to give anybody notice of an application for entry of default or of a default judgment, unless they make some appearance. And then there's some authority that if they make some effort to contact counsel or the court, they have to be included. So the timeline in this case is we filed the amended complaint. We served it. We served it on Mr. Woodruff's secretary. March 5 was the end of 10 working days. On March 6, we moved for entry of default. On March 6, the Clerk of Court entered default. Two plus days later, on March 8, at the end of the day, uh, Mr. Woodruff sent me the email, which I chose to ignore.

Normally, I wouldn't move that quickly, but, frankly, as court-appointed counsel, half my fees come from the Court, which means the taxpayer, and the other half comes from my colleagues in the Bar Association.

And it's amazing to me, if we look at Mr. Woodruff's email -- he's attached it in his declaration -- I'm sorry, he's, yes, he has, he's attached it to his declaration. He

says, "Tom, I'm not sure when you served me with the FAC in the above above-referenced action . . .

1040

. . . so I am not sure when my response is due." So there's two reasons why I can't agree as court-appointed counsel to prosecute the matter to the lifting of the default or anything but entry of judgment today.

The first is this is a disciplinary proceeding, and I don't have a client I can consult about whether they are willing to pay me extra money. I have the taxpayers for 50 percent and my colleagues as a group for 50 percent. It's not appropriate for me to give extensions.

The second reason is, as the Supreme Court, uh, noted in the interim suspension, even on the interim suspension action, Mr. woodruff, unfortunately, there's nothing happy about this, but Mr. Woodruff wasn't even able to be timely in responding into the interim suspension action.

On this, I took the extraordinary step of putting a footnote on page 1 of the amended complaint saying when it was due -- ten days from service -- obviously that's ten working days. Uh . . . Nobody ever does that. And it's beyond the pale of belief that Mr. Woodruff, receiving an amended complaint, with nine separate disciplinary cases combined into one complaint, would not know when he received it. That's just, that's just beyond the pale. And, of course, it's especially ironic, because all those nine cases point to a pattern or practice of not knowing when his deadlines are, for always different excuses, never appearing, rarely appearing in court on time -- in these cases -- and missing all kinds of deadlines. So it is particularly appropriate for the default not to be set aside.

THE COURT: Thank you, Mr. Clifford.

MR. WOODRUFF: Your Honor, that's ... you know ... I mean certainly there are true statements in what Mr. Clifford said, but that's not, taken as a whole, it's not in any way whatsoever

true. As he indicated, he served the complaint on my staff. Ordinarily, it would have been noted on the, on the document, the time it was received. It wasn't. I have many other obligations that I have to meet. But the burden on me, and the obligations I have to meet were increased by the actions of the Supreme Court. In the Supreme Court, I specifically, I specifically asked for additional time to, uh, uh, respond, uh, and I was not granted the time that I asked for. I needed that time because of the nature of what was submitted. Mr. Bellas, when he filed his application in the Supreme Court never even served me with the application. The entire process, from the actions of the Disciplinary Committee through the Supreme Court, and now with Mr. Clifford in this courtroom, is to attempt railroad me on, on nine disciplinary charges, uh, generated over a period of six years. I don't think it is even proper for, for, uh, that to be done. You don't take six years of complaints, uh, uh, and then try to aggregate them somehow into something to file as disciplinary complaint. And then before the compliant is even filed initially in this Court, in accordance with the rules set forth by the Commonwealth Supreme Court, go into the Supreme Court and ask for interim suspension, uh, completely outside of the, uh, of the rules. And then, and then when the attorney needs time to respond to all of these things that, for which I can give very detailed responses, to every single one of them. But that's a demanding and time-consuming . . .

THE COURT: As I understand the Supreme Court action that you say is outside the rules [Unintelligible] filed by the Disciplinary Committee was out of a feeling of necessity, by a consensus of the committee, that they had to stop what they felt was a continuing and blatant violation of the public's . . . of the trust of a attorney, that the public should have in an attorney.

MR. WOODRUFF: Taking . . . It is not "a continuing and blatant" . . .

THE COURT: Alright. Mr. Woodruff, I'm not going to engage this. Right now we're here for default judgment. Uh . . . And let's bear in mind, I've been hearing your excuses, which . . . for the last 12 years. I, I have documented it, if ever I need to produce it,

but that's, that's not here. But I do take judicial notice of it. You've had excuses, uh, uh, non-appearances, non-filings, late, not showing up.

MR. WOODRUFF: Your Honor, respectfully . . .

THE COURT: Let's not even get into that. I'm not interested in any excuses. What I'm going to do, I'm going to give you a slight benefit of the doubt. I'm going to read your papers. I'm going to take this under advisement.

MR. CLIFFORD: I was going to make that procedural point, Your Honor. We have, I have no objection, as prosecuting counsel, I have no objection to this being . . .

**1045**

. . . uh, received and considered by the Court. I don't need to oppose it any more than I have verbally on the record. And so we have no objection if the Court rules without anything in writing from me.

THE COURT: Alright. If I rule . . . If I don't vacate the judgment, then I'll just reset another hearing next week.

MR. CLIFFORD: Eh, eh, Your Honor, if I may. I haven't done one of these in this context before, uh. Given that the Disciplinary Rules say that the charges are deemed admitted, . . .

THE COURT: Right.

MR. CLIFFORD: I wasn't planning on presenting any, any proofs.

THE COURT: No, I won't accept any proof. [Unintelligble] default judgment.

MR. CLIFFORD: Okay.

THE COURT: Eh, default judgment is . . . If I enter it, there's a question if we need another hearing.

MR. CLIFFORD: Right.

THE COURT: 'cause at that time, I have 20 days thereafter to enter a decision . . . on the, on the violations. Alright, as it stands now, I'm going to review the package I received a few minutes before the hearing, to see if they're acceptable. If they are acceptable, you don't want any opportunity, you feel you've responded, if I do accept, your response is on the record.

MR. CLIFFORD: That's right, Your Honor.

THE COURT: Then the Court will make a ruling in a short time.

MR. CLIFFORD: Ump. I'm sorry. One more point, Your Honor, I want to make. Mr. Woodruff did concede, in his presentation, Mr. Woodruff did concede that he did receive the First Amended Complaint, and his secretary did receive it.

MR. WOODRUFF: Absolutely, Your Honor. I would not at any time, uh, do other than represent the facts as they actually are. And, and I do wish Your Honor to note that in every instance where there's been something, every case has to be, and every instance needs to be considered on its own facts. And in every case in this courtroom or in any other courtroom where there was an issue of timing or whatever, it's on the record what was, what the circumstances were. And, and, and as far as this case is concerned, we have to, uh, remain within the scope of, of the pleadings and, and what has been brought before this Court by the Disciplinary Committee.

THE COURT: Uh, one, one thing. If I decide not to vacate the judgment . . . I question whether we need a hearing for default judgment.

MR. WOODRUFF: Your Honor, if you, if you, uh . . . I am entitled to be heard with regard to . . . .

THE COURT: You would. In accordance with the record so far, you didn't take advantage of that opportunity by filing an answer timely.

MR. WOODRUFF: You Honor, even if that, if that were accepted as being final. That, uh, uh, the charges are deemed admitted, uh, as I think Mr. Clifford was, uh, saying.

THE COURT: Yeah, that's what the rules provide.

MR. WOODRUFF: Uh, uh, the, I would still be entitled to be heard with regard, uh, to what discipline would be appropriate . . .

THE COURT: Yes, yes, you would be.

MR. CLIFFORD: I don't have any objection to that, Your Honor.

THE COURT: I'm going to take a look at these. Whether I accept them or not, I'm going to decide. If I accept them, uh, depending on my decision, if I do not vacate the judgment, then we'll set it for hearing, and you'll get notice of that, Mr. Woodruff.

MR. WOODRUFF: Yes, Your Honor, thank you.

THE COURT: We'll stand in recess.

**CERTIFICATION**

I hereby certify that the foregoing transcript of proceeding on March 14, 2013, before JUDGE DAVID A. WISEMAN in the case of:

**IN RE THE MATTER OF STEPHEN C. WOODRUFF**

**Respondent**

**Civil Action No. 13-0017**

is an accurate, verbatim transcript from the digital audio recording from the Commonwealth Superior Court.

CATHERINE A. TORCULAS
PMB 652 Box 10003
Saipan, MP 96950
Tel.: (670) 235-1913

Completion Date: April 21, 2014

DATE: 5/15/13 TIME: 2:21 pm

IN THE SUPERIOR COURT
OF THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| **IN RE THE MATTER OF:**<br><br>**STEPHEN C. WOODRUFF,**<br><br>**Respondent.** | **Civil Action No. 13-0017**<br>**Disciplinary Cases**<br>**1) 2008-008; 2) 2008-12; 3) 2009-001; 4) 2009-005; 5) 2011-012; 6) 2011-013; 7) 2011-014; 8) 2012-001; 9) 2012-004**<br><br>**DECLARATION OF JIHYUN LEE** |

I, Jihyun Lee, declare and state, under penalty of perjury, as follows:

1. I have been a client of Stephen C. Woodruff since July of 2011. I have never terminated his representation of me and my children and am satisfied with the services rendered to us.

2. In early 2012, I did visit USCIS to inquire about the matter being handled for me by Mr. Woodruff. I did so at the suggestion of someone at Ladera School, in which I had a financial interest that was at risk on account of the mismanagement of the principal owners. An officer at USCIS told me that someone else had a similar "problem" with Mr. Woodruff and that I should go talk with Mr. Timothy Bellas of the CNMI Bar Association Disciplinary Committee. I was told I should write a statement about my problem. I did so because I assumed that the officer at USCIS was knowledgeable and that following the advice was the thing to do and could help. I

did not really think about it. I just followed the advice. I did not think it was something to would get Attorney Woodruff into trouble. I certainly did not think he would be suspended from the practice of law.

3. Attached is a true copy of the letter I wrote on the advice of the USCIS officer. With respect to Mr. Woodruff, that letter simply states that I did not yet have a USCIS receipt for my application 7 months after engaging Mr. Woodruff for that purpose. Most of my letter discusses the real problems I had with other people, not Mr. Woodruff. In fact, my letter specifically acknowledges that Mr. Woodruff did provide me with documents (copies of which were appended to the letter), unlike Mr. Kim,Jae Boong about whom I complained.

4. I disagree with the interim suspension imposed on Mr. Woodruff by the Commonwealth Supreme Court. I do not believe Mr. Woodruff should be suspended at all. I need him to be available to provide legal advice and representation to me, and I know many others do as well.

5. Several months ago, I received a letter from the CNMI Bar Association Disciplinary Committee stating that the investigation regarding Mr. Woodruff was "closed." I understood that to mean that was the end of everything related to my discussion with Mr. Bellas. That was fine with me. I was therefore very surprised to learn that my matter was part of the grounds for the Disciplinary Committee's allegations of attorney misconduct against Mr. Woodruff.

6. Mr. Woodruff has shown me a copy of the First Amended Complaint ("FAC") in the above-captioned matter, of which Disciplinary Case No. 2012-001 (paragraphs 95 through 104) relates to a complaint I purportedly filed against Mr. Woodruff. When I wrote the letter, and when I met with Mr. Bellas, it was not my intention or desire to have Mr. Woodruff suspended from the practice of law or otherwise disciplined as a lawyer. My concern was what happened to my E-2C petition and the immediate relative applications for my three sons. I was seeking help with respect to that concern.

7. Paragraph 97 of the FAC is completely false. Mr. Woodruff did the work he was paid to perform and much more. Attached hereto are true copies of the USCIS receipts for the I-129 filed on my behalf and the I-539 filed for my sons. Also attached hereto is a recent request for evidence that Mr. Woodruff was helping me with prior to his suspension.

8. I never told Mr. Woodruff about my meeting with Mr. Bellas, my letter to USCIS, or what the USCIS officer had told me. I continued to work with Mr. Woodruff on my matter over the ensuring months. It is not clear what caused the long delay before USCIS began processing our paperwork and issued a receipt; however, Mr. Woodruff has advised me that similar problems have occurred in a number of other cases.

9. I do not know what "information" is relied upon for paragraph 98 of the FAC, which suggests that "Mr. Woodruff never completed the application." That suggestion is incorrect. Mr. Woodruff completed all the paperwork and I signed it before my sons and I left for Korea in July of 2011. The Bar Association Disciplinary Committee even had a copy of the applications. I wrote the checks to the Department of Homeland Security for the application fees and gave them to Mr. Woodruff for submission with the paperwork.

10. Paragraph 99 of the FAC is also wrong. I did not submit a "complaint" to USCIS, I went there to inquire about my matter. I do not know what USCIS did or did not do after my visit.

11. I believe Mr. Woodruff is a very capable and competent attorney. I believe he is diligent in his work and completes all matters as promptly as he can under the circumstances. His greatest difficulty is he is too busy. This is because he is so much in demand, he has so many clients. That alone should tell the Court something about his competence, diligence, communication skills, and character. His fees are very reasonable. He takes time to talk to everyone and explain everything the best he can. He keeps confidences. So far as I know, he never failed to communicate to me anything that he knew about my matter. There have been

many communications from USCIS about my matter, and he or his office has always contacted us about them.

12. Mr. Woodruff has drafted the declaration on my behalf, but I have carefully read it and confirm that everything in it is based on what I know, what I told Mr. Woodruff, and as I understand the truth to be. Mr. Woodruff did not pressure me in any way to prepare this declaration. Neither did he offer me any reward for doing so. I took several days to review this declaration, make corrections, and be sure everything is accurate. I make this declaration of my own free will because it is the truth and because I do not agree with the actions taken against Attorney Woodruff.

I, Jihyun Lee, declare and state, under penalty of perjury, that this declaration is true and correct, to the best of my recollection and belief, and is based on my personal knowledge.

Executed this 30th day of April, 2013, on the island of Saipan, Commonwealth of the Northern Mariana Islands.



JIHYUN LEE

USCIS

Rcvd SEF 2/4/12
Case # 2012-01

Jan 27th, 2012-01-27

To whom it may concern

I, JIHYUN LEE, paid partial payment of $1,500.00 with USCIS filing fees by checks to attorney Woodruff to apply for E2-C status for myself and E2-C dependent for my children, whose names are JUNYEONG PARK, JUNSEO PARK and JUNHYUN PARK, on July 07, 2011. However after 7 months that I requested Mr. Woodruff to apply my E2-C status, I have not been receiving any receipt of E2-C from Mr. Woodruff.

On November of 2011, I also paid a guy named KIM, JAEBOONG $1,000.00 as a processing fee for the CW-1 Visa and CW-2 for my children($500.00). However, KIM, JAEBOONG did not give me USICS receipt and other documents like Mr. Woodruff did. Then he suddenly emailed me on Jan 25th, 2012 that he could not process on CW-1 and CW-2 visa anymore.

Last but not least, I have made the investment of $250,000.00 under I.L.C. on September, 2008. When I made this investment, President, Yong Nam Park and Vice-President, Sung Yun Kim, advertised that investment to their company would securely get investors green card and secure status on the island Saipan. Of course, they promised me the same proposals, which are the green card and secure status. Park, Yong Nam still lives in this island but he didn't take any responsibilities and Kim, Sung Yun ran away to Malaysia.

The things I was doing were trying to live on this island with legal status and trust people. However, I don't understand why they are damaging my life. Currently I run businesses of house rental and catering. I would ask a question of what I need to do to make everything right. In this situation, what kind of visa is available to our family? Please help our family that who wants to achieve our dream on this island.

Therefore, I politely request an investigation on whether Mr. Woodruff and JAEBOONG KIM did apply my visa or they didn't start anything from beginning, and investigation on Park and Kim to find out their fault and way to get my invested money back. I would ask a way to secure status of me and my children. I put contact number and email addresses of listed people in this letter below.

*Stephen C. Woodruff
Contact number: 287-5291
Email address: scwlaw.spn@gmail.com
Mailing address: P.O.Box 500770 Saipan MP 96950

*Kim Jae Boong
Contact number(670)989-1789
Email address:u.s saipan@gmail.com

*Park, Yong Nam
Email: parkyoung75@hotmail.com, parkyoung7537@lycos.co.kr
parkyongnamlissilc@hotmail.com

*Kim, Sung Yun
Contact:82-10-2329-7791
Email address:annakim0908@yahoo.co.kr
P.O.Box 505049, Saipan MP96950
Address:Suite J-2-11,2 Jalan Solaris, Mont' Kiara 50480, Kuala Lumpur, MALAYSIA

My contact number, email address and mailing address are listed below.
This is confidential.

Thank you very much for your consideration and understanding.

Sincerely

JIHYUN LEE
P.O.Box 7931 SVRB
SAIPAN MP 96950
Email:03flower@naver.com
Contact:(670)9893663 or (670)9895552

CC: CNMI BAR ASSOCIATION

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**I-797C, Notice of Action**

THE UNITED STATES OF AMERICA

| | | | |
|---|---|---|---|
| **RECEIPT NUMBER** WAC-1[illegible]-120-5[illegible] | | **CASE TYPE** I129 PETITION FOR A NONIMMIGRANT WORKER | |
| **RECEIVED DATE** March 27, 2012 | **PRIORITY DATE** | **PETITIONER** LEE, JI HYUN | |
| **NOTICE DATE** March 28, 2012 | **PAGE** 1 of 2 | **BENEFICIARY** A200 [illegible] 618 LEE, JI HYUN | |

STEPHEN C WOODRUFF
RE: ILT DOPP BACHE ENTERPRISES
P [illegible] BOX [illegible]
SAIPAN MP 96950

**Notice Type:** Receipt Notice
Amount received: $325.00 U.S.
Class requested: E2C

**Receipt Notice** – [illegible] **If any of the above information is incorrect, please immediately call 800-375-5283 to let us know.** [illegible]

[illegible] the date shown.

**Processing time** – [illegible] You can check our [illegible] to which this case [illegible] sign up to receive free [illegible] pending, however, [illegible] changes, because [illegible] show on our [illegible] final decision [illegible] this notice, and [illegible] any means, [illegible]

**If this case is an I-130 Petition** – [illegible]

**Applications requiring biometrics** – [illegible]

**If your address changes** – [illegible]

[illegible]

Please see the additional information on the back. You will be notified separately about any other cases you filed.
[illegible] CITIZENSHIP & IMMIGRATION SVC
CALIFORNIA SERVICE CENTER
P. O. BOX [illegible]
LAGUNA NIGUEL CA 92607-[illegible]
**Customer Service Telephone: (800) 375-5283**

024

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

# I-797C, Notice of Action

THE UNITED STATES OF AMERICA

| RECEIPT NUMBER | | CASE TYPE I129 PETITION FOR A NONIMMIGRANT WORKER |
|---|---|---|
| WAC-12-120-50934 | | |
| RECEIVED DATE | PRIORITY DATE | PETITIONER |
| March 2?, 2012 | | LEE, JI HYUN |
| NOTICE DATE | PAGE | BENEFICIARY A200 ?59 678 |
| March 28, 2012 | 2 of 2 | LEE, JI HYUN |

[illegible]

U.S. CITIZENSHIP & IMMIGRATION SVC
CALIFORNIA SERVICE CENTER
P. O. BOX 30111
LAGUNA NIGUEL CA 92607-0111
**Customer Service Telephone: (800) 375-5283**

Form I-797C (Rev. [illegible]) Y

025

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

# I-797C, Notice of Action

THE UNITED STATES OF AMERICA

| RECEIPT NUMBER | | CASE TYPE I129 APPLICATION TO EXTEND/CHANGE NONIMMIGRANT STATUS |
|---|---|---|
| RECEIVED DATE<br>March [illegible] | PRIORITY DATE | APPLICANT [illegible]<br>PARK, JUNSEUNG |
| NOTICE DATE<br>March [illegible], 201[illegible] | PAGE<br>1 of 1 | |

STEPHEN C WOODRUFF
2ND [illegible] BLDG PARK
P.O. BOX [illegible]
SAIPAN MP 9695[illegible]

**Notice Type:** Receipt Notice
Amount received: $290.00 U.S.
Classes vary by individual

**Receipt Notice** - [illegible] **If any of the above information is incorrect, please immediately call 800-375-5283 to let us know.** [illegible]

[illegible] benefit, not [illegible] the date shown.

**Processing time** - [illegible] type. You can check our [illegible] office to which this case [illegible] sign up to receive free [illegible] pending, however [illegible] in our [illegible] decision [illegible] this notice, and [illegible] by means, a [illegible]

**If this case is an I-130 Petition** - [illegible] I-130, Petition [illegible] beneficiaries of a [illegible]

**Applications requiring biometrics** - [illegible]

**If your address changes** - [illegible]

Please see the additional information on the back. You will be notified separately about any other cases you filed.
U.S. CITIZENSHIP & IMMIGRATION SVC
CALIFORNIA SERVICE CENTER
P. O. BOX [illegible]
LAGUNA NIGUEL CA 92607-0111
**Customer Service Telephone: (800) 375-5283**

Form I-797C (Rev. [illegible])

026

Department of Homeland Security
U.S. Citizenship and Immigration Services

# I-797C, Notice of Action

THE UNITED STATES OF AMERICA

| RECEIPT NUMBER | | CASE TYPE I-539 APPLICATION TO EXTEND/CHANGE NONIMMIGRANT STATUS |
|---|---|---|
| RECEIVED DATE [illegible] | PRIORITY DATE | APPLICANT [illegible] BARRY, [illegible] |
| NOTICE DATE [illegible] | PAGE [illegible] | |

[illegible]

CALIFORNIA SERVICE CENTER
P. O. BOX [illegible]
LAGUNA NIGUEL CA [illegible]
Customer Service Telephone: (800) 375-5283

Form I-797C (Rev. [illegible])

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**I-797E, Notice of Action**

| | | |
|---|---|---|
| A # | | Application/Petition: I-129, Petition for A Nonimmigrant Worker |
| Receipt #: WAC1212050934 | | Applicant/Petitioner: Lee, Ji Hyun |
| Notice Date: November 28, 2012 | Page: 1 of 4 | Beneficiary |

WOODRUFF, STEPHEN C
P O BOX 500770
SAIPAN, MP 96950

Request for Evidence

Notice also sent to:

**RETURN THIS NOTICE ON TOP OF THE REQUESTED INFORMATION LISTED ON THE ATTACHED SHEET.**

**Note: You are given until February 20, 2013 in which to submit the requested information to the address at the bottom of this notice.**

Please note the required deadline for providing a response to this Request for Evidence. The deadline reflects the maximum period for responding to this RFE. However, since many immigration benefits are time sensitive, you are encouraged to respond to this request as early as possible but no later than the date provided on the request.

**Pursuant to 8 C.F.R. 103.2(b)(11) failure to submit ALL evidence requested at one time may result in the denial of your application.**

**For more information, visit our website at www.uscis.gov**
**Or call us at 1-800-375-5283**

**Telephone service for the hearing impaired: 1-800-767-1833**

CSC2697 WS22603 DIV 1 MN

**You will be notified separately about any other applications or petitions you filed. Save this notice. Please enclose a copy of it if you write to us about this case, or if you file another application based on this decision. Our address is:**

USCIS - CALIFORNIA SERVICE CENTER
P.O. BOX 10590
LAGUNA NIGUEL, CA 92607-0590
800-375-5283

WAC1212050934

**Please see additional information on the reverse side.**

Form I-797E (Rev. 05/05/06)

028

*Any document submitted to USCIS containing a foreign language, must be accompanied by a full English language translation that has been certified by the translator as complete and accurate, and that the translator is competent to translate from the foreign language into English.*

**E-2 CNMI Investors**

The E-2 CNMI Investor (E2C) nonimmigrant classification applies to certain aliens who were previously granted qualifying long-term investor status (such as long-term business investor, foreign investor, or retiree investor status) in the CNMI under the CNMI immigration laws that were in effect prior to November 28, 2009. The purpose of the E2C classification is to afford CNMI investors a transitional nonimmigrant status that enables them to remain in the CNMI and maintain their investment during the transition period from CNMI immigration law to Federal immigration law.

You have filed Form I-129, Petition for Nonimmigrant Worker, requesting the E2 CNMI investor nonimmigrant classification (E2C). To process your petition and determine the eligibility, additional evidence is required. Evidence must show that you were eligible for the requested benefit when the Form I-129 was filed. Submit the following information to establish that you qualify for E-2 CNMI investor classification:

**APPROVAL OF LONG-TERM INVESTOR STATUS**

In order to establish eligibility for the E2C classification, you must submit documentation establishing that the CNMI government approved a qualifying investment prior to November 28, 2009. Please submit:

- A legible copy of your CNMI issued "Foreign Investment Certificate."

Please note that if you were an approved CNMI long-term business investor or CNMI foreign investor, and your I-129 petition for E-2C is approved on that basis, you will receive an approval notice authorizing employment incident to status. However, submission of your "umbrella" permit alone will not establish on what CNMI Investor status you were admitted to the CNMI and your continued eligibility to seek employment in the CNMI. Therefore, you should submit a copy of both your Long-Term Business Certificate or Foreign Investment Certificate, and the umbrella permit in order to receive the proper employment authorization.

**EVIDENCE PERTAINING TO MAINTENANCE OF INVESTMENT**

In order to establish that the investment that formed the basis of the CNMI long-term investment status has been maintained, please submit the following evidence:

**Foreign investors and long term business investors:** An investor was granted in the CNMI under CNMI law to either:

1) **Foreign investor**: an alien who has invested a minimum of $100,000 in an aggregate approved investment in excess of $2,000,000, or a minimum of $250,000 in a single approved investment;

or

2) **Long-term business investor**: An alien who has an approved investment of at least $50,000 in the CNMI.

In support of the petition, you have submitted the following evidence:

- Copy of your Application for Remittance showing $50,000 was requested to send to Kim Sung Hyun; and
- Copy of a receipt showing the beneficiary has paid $30,000 to Sharkir's CNMI Inc.

However, this evidence is insufficient to establish that you have maintained your investment in the CNMI. As such, it is requested that you provide sufficient evidence to show that you satisfy this requirement. Evidence may include, but is not limited to:

- Approval letter from the CNMI government;
- Evidence that capital has been invested;
- Evidence that you have invested at least the minimum amount required;
- Comprehensive business plan for new enterprises;
- Articles of incorporation, by-laws, partnership agreements, joint venture agreements, corporate minutes and annual reports, affidavits, declarations or certifications of paid-in capital
- Current business licenses;
- Foreign business registration records, recent tax returns of any kind, evidence of other sources of capital;
- Listing of all resident and nonresident employees;
- Listing of all holders of business certificates for the business establishment;
- Listing of all corporations in which you have a controlling interest; and/or
- Copies of annual reports of investment activities in the CNMI showing that you are complying with standards of issuance of certificate of foreign investment. Each report must be accompanied by an annual financial audit report performed by an independent certified public accountant.

**EVIDENCE PERTAINING TO MAINTENANCE OF CNMI RESIDENCE**

Eligible investors must have continuously maintained a residence in the CNMI since lawfully admitted as a long-term investor and have been physically present therein for periods totaling at least half that time. The residency requirement would not be met if one of the following occurs:

1) An absence from the CNMI for a period of more than 6 months but less than 1 year after such lawful admission shall break the continuity of such residence unless such alien establishes to the satisfaction of DHS that he or she did not in fact abandon residence in the CNMI during such period.

2) Absence from the CNMI for any period of more than one year during the period for which continuous residence is required shall break the continuity of such residence.

**Continuously maintained residence in the CNMI:** The record is not clear that you have met the maintenance of residence requirement. Provide documentary evidence of all your entry and exits into and out of the CNMI in Long-Term Business Investor, Foreign Investor, or Retiree Investor status. Additionally, provide documentation to establish that you have satisfied the residency requirement. The evidence may include but not limited to proof for all residential addresses, e.g., telephone bills, utility bills, rent receipts, since arrival in the CNMI.

**EVIDENCE PERTAINING TO ELIGIBILITY FOR A GRANT OF STATUS**

An investor who is lawfully present in CNMI with a valid unexpired CNMI permit that was issued prior to November 28, 2009 or a parole status issued by CBP or USCIS after November 27, 2009 may request a Grant of Initial E2C Status in the CNMI. In order to be eligible for a Grant of Status request, you must establish:

- That you are lawfully present in the CNMI;
- That you were present in the CNMI before November 28, 2009; and
- That you are admissible.

You filed this I-129 petition on March 27, 2012. As evidence, you submitted a copy of your umbrella permit with an expiration date on November 27, 2011. You also provided a copy of your Departure Record showing that you were paroled into the CNMI until January 31, 2012. At the time of filing this I-129 petition, it appears that you had no lawful present status in the CNMI. Please submit sufficient documentary evidence to show that you are eligible for a grant of status.

**CERTIFICATE OF SERVICE**

I hereby certify that on May ~~2~~ 3, 2013, I caused a copy of the foregoing DECLARATION OF JIHYUN LEE to be served, by hand delivery, upon the following Disciplinary Counsel:

Thomas E. Clifford, Esq.
Attorney at Law
2nd Floor, Alexander Bldg., San Jose
P.O. Box 506514
Saipan, MP 96950

STEPHEN C. WOODRUFF F0190
Respondent

E-FILED
CNMI SUPREME COURT
E-filed: Apr 30 2014 03:50PM
Clerk Review: Apr 30 2014 04:08PM
Filing ID: 55370380
Case No.: 2013-SCC-0030-CIV
Nora Borja

E-FILED
CNMI SUPERIOR COURT
E-filed: Apr 22 2014 10:26AM
Clerk Review: Apr 22 2014 12:41PM
Filing ID: 55331666
Case Number: 13-0017-CV
Kristy Diaz

**IN THE SUPERIOR COURT**
**OF THE**

**COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| **IN RE THE MATTER OF:** | **Civil Action No. 13-0017** |
| **STEPHEN C. WOODRUFF,** Respondent. | **TRANSCRIPT OF PROCEEDINGS** HEARING BEFORE JUDGE DAVID A. WISEMAN May 15, 2013 |

033

# Transcript of Proceedings

## Superior Court of the Commonwealth of the Northern Mariana Islands

## May 15, 2013 Default Hearing

## *In the Matter of Stephen Woodruff*, Civil Action No. 13-0017

**1435**

CLERK: Court's back in session.

THE COURT: Okay, be seated. Alright, this is a sealed hearing on the 15th day of May. In the Matter of Stephen Woodruff. Zero, uh, this is [Clears throat] Thirteen-dash-seventeen. Alright. At this time, this matter is set for a hearing on the default judgment. And, Mr. Clifford?

MR. CLIFFORD: I would like to be heard, Your Honor, if I may?

THE COURT: Yes, of course.

MR. WOODRUFF: Your Honor, if I may, before Mr. Clifford , uh, begins. I would respectfully suggest that Your Honor should recuse yourself from this case. Uh, on, I think it was March 14th, the first time I appeared in this case, Your Honor indicated, uh, an intention to take judicial notice of matters that are entirely outside of the scope of the complaints alleged here, uh, and referred to an alleged history of mine, uh, uh, in this court. Uh . . . That's, uh, evidence of, uh, uh, a tendency to prejudge the, the case.

THE COURT: No, its not, Mr. Woodruff. If you check the law on recusal, it's only extra-judicial matters that, uh, may qualify a judge to be recused.

MR. WOODRUFF: Your Honor, uh, in this particular case. This is a disciplinary case, Your Honor, and the U.S. Supreme Court has ruled that disciplinary cases are quasi-criminal in nature, and the U.S. Supreme Court specifically ruled in *In re Ruffalo* that, uh, uh, taking into account anything outside the scope of the pleadings is a violation of due process.

THE COURT: That's for making a decision in the case, but I can consider anything, uh, related, anything that has reliable information, for purposes. For example, in criminal cases for purposes of sentencing, I can consider anything, even if it's outside in the hallway, if its reliable. So I have unfettered discretion in sentencing. And when I mentioned that judicial notice, it wasn't for anything to do with the pleadings in the case, because the pleadings were taken as admitted, because you're in default.

MR. WOODRUFF: You took that as evidence with regard to . . .

THE COURT: Alright, that's your interpretation. Your request is denied, Mr. Woodruff.

MR. WOODRUFF: Well ... very well, Your Honor, but I had additional points that I would, uh, make in that, uh, re–

THE COURT: Well, they're not inviting. I mean, there's no motion time set, there's no notice of hearing. I'm not entertaining it.

MR. WOODRUFF: This, this is true, Your Honor. And then another issue I have here, Your Honor, is that the whole nature of . . . there's some very fundamental flaws with the whole question of how we are proceeding here, Your Honor. As . . . And Mr. Clifford and I seem to have very fundamental differences about what, uh, is the nature of a, uh, default, which I maintain that default is wholly inappropriate anytime when the attorney appears, uh, and is seeking to be heard. Uh, in a disciplinary case, uh, to, uh, have default is inappropriate, because in order for . . . Even if, even if there was the basis for finding of misconduct, there's still necessary to have a complete and thorough evidentiary record in order to determine what . . .

THE COURT: Nah. Mr. Woodruff. I, I have . . .

MR. WOODRUFF: . . . the appropriate discipline is.

THE COURT: I have a written order dealing with your issue of default. So, uh . . .

MR. WOODRUFF: Yes, yes, yes, Your Honor.

THE COURT: So we don't have to dwell on that.

MR. WOODRUFF: And that order itself is further evidence of Your Honor's bias and prejudice against me with regard to this case because the entire process . . .

MR. CLIFFORD: Your Honor, this . . . I'm going to object. I don't think Mr. Woodruff has the right to come in here and attack the court or raise any another issues that aren't before the Court.

THE COURT: Yeah. I agree.

MR. CLIFFORD: I mean if he thinks that the default improperly entered, or that Your Honor should have recused yourself, or that I'm acting improperly, or the Disciplinary Committee acted improperly, then he'll have his chance with the Supreme Court, and maybe they'll agree. That's how it works.

MR. WOODRUFF: Well, and I have made those points on the record, and I would have, I would have appreciated the opportunity to make them more thoroughly.

THE COURT: Mr. Woodruff, at this time you're here as the, in a default status.

MR. WOODRUFF: Yes, Your Honor, which is . . .

THE COURT: The only, the only, the only subject I am going to let you speak to is the sanctions that, uh, discipline that Mr. Clifford is going to recommend. That's it.

MR. WOODRUFF: Well then, . . .

THE COURT: I am not gonna hear anything else. Now, I'll exclude you if you'll insist on interrupting this proceeding.

MR. WOODRUFF: No, I'm not interrupting the proceeding.

THE COURT: [Angrily] No, I am not gonna hear anything else. I'm only gonna hear what's this hearing is scheduled for today, where you have the courtesy as a, someone in default to speak only with respect to . . . If this involved damages, you're allowed to speak to damages.

**<u>1440</u>**

MR. WOODRUFF: Which this is not a damages case, Your Honor.

THE COURT: Right, but the damages are . . . I mean you're allowed to speak to the disciplinary, eh, the, the discipline that's going to be recommended, or for the Court to consider. That's it.

MR. WOODRUFF: Yeah, but, but ... Well, there's one aspect of that which is what I was trying to say Your Honor, and only this one thing, which is the, where I said there is fundamental difference in Mr. Cliffords's view of what a default proceeding is, especially in a disciplinary case. And I'm not sure what Your Honor's position is.

MR. CLIFFORD: Well, I'm, I'm gonna speak . And what I would propose, Your Honor, is, I'm, I'm gonna address that, then after that, maybe Mr. Woodruff can have an opportunity to respond.

THE COURT: Of course, the Court will give him an opportunity at that time.

MR. WOODRUFF: That is fine, Your Honor.

THE COURT: Alright.

MR. WOODRUFF: I will allow Mr. Clifford ...

THE COURT: Yeah.

MR. WOODRUFF: . . . to proceed, and I will reserve my, my comments until after he has proceeded.

THE COURT: Okay. Mr. Clifford?

MR. CLIFFORD: Thank you, Your Honor. I mean I think the starting place we've already really covered, which is the default has already been duly entered, ah, and, of course, counsel never asked to for any kind of extension until after default had been entered. That's all been, uh, covered , and it's not before the court today. Uhm, and as the Court noted, that, uhm, you know, it really isn't . . . sort of an early response to what Mr. Woodruff will say. It's not really a question of what the Court is saying on its own, or what Disciplinary Counsel is saying. It's what the rules say. We you, when default is entered, the allegations in the complaint are being admitted. And so when Disciplinary Rule 9(c) says that if the charges on the complaint aren't timely responded to, they are quote deemed admitted unquote, that wasn't made of whole cloth. That was obviously taken from Rule 55 regarding default. So both because the disciplinary rule says the charges are deemed admitted, and because of, by default we go to the rules of civil procedure and evidence, which the rule of civil procedure provides that allegations following default are deemed admitted, all that's already admitted.

Uh, I wanna address two things today. One is, uhm, what my recommendations are gonna be, and I wanna do that second. And then first i wanna speak to the basis for the recommendations, because I think, I think that, that touches on the merits, but the basis for the recommendations, uh, uh, I think is appropriate for the court to hear from myself and Mr. Woodruff, because it will guide the court perhaps in terms of, uhh, how severe a sanction to impose, if any.

Uhm, as the Court knows, I've only done a few of these. I don't usually recommend discipline. I am in this case because this case is unique in, in two ways of those that

I've seen, and I think in the history of the Commonwealth. First, the Supreme Court issued an interim suspension in which it noted it's already entered interim suspensions in the past, but not in this context. Second, uh, this complaint is, the First Amended Complaint is, based on nine separate charges – not one or two or three, but nine, and there's more, uh, coming through the system, as we all know.

Uhm, therefore, what I did is, uh, because the rule that governs the appointment of Disciplinary Counsel says, uh, that prior to recommending any final resolution, check with the committee. I contacted the chairman of the disciplinary committee, Mr. Bellas. He consulted with the full committee, at a meeting, and told them what my recommendation was, and they agreed. So the recommendation that I make today, uh, is . . . I'll say it generally now and get into in detail later, is that Mr. Woodruff be disbarred outright, or, alternatively, indefinitely suspended until such time as he can satisfy the court that he can manage his practice without prejudice to his clients. And – make the, the complainants in these cases of reasonably whole.

I'll get to those of specifics later. Maybe, if the Court agrees, we'll do those one by one, since there are nine involved, and then i think he should also have to pay Counsel's fees. The court and the bar association shouldn't bear that expense. The basis for that severe recommendation, because any one of these, of nine. The, the two where discrimination . . . We'll get to these in detail later. But the two where discrimination cases were brought in Federal Court: Cambronero and Feliciano. Of course, the complaints seek punitive damages, serious discrimination damages, unpaid wages, breach of contract, et cetera. Those are very serious cases, and having, allowing those to be dismissed, uh, one for failure to appear for trial, as the culmination of many mistakes, according to the judge presiding over that case, uh, retired Chief Judge Munson. And then in Cambronero, uh, failing to oppose a summary judgment. Those are very serious. The others of them only go to untimely processing. In some cases the people gave up, like Ken and Wanlapha Warfle. In other cases, they stuck with Mr. Woodruff, and after they complained, and only after they complained, he completed their work.

**1446**

But, the reason that, uh, the Disciplinary Committee joins with counsel in this severe recommendation, or recommendations of severe, uh, uh, discipline, is because of the pattern. Taken together, they show that, uh, Mr. Woodruff is not able to manage the docket that he has. He is not able to protect his clients. And, of course, while this court is not directly bound, I mean at this stage at least, by the Supreme Court's order of the interim discipline, it is instructive to look, uh, at what they said initially in the interim suspension. The Court will recall perhaps that they, uh . . .

MR. WOODRUFF: Your Honor, I object because the Supreme Court decision is not in any way relevant to this proceeding. It wasn't, it wasn't a proceeding according to the disciplinary rules. It wasn't a proceeding for the purposes of establishing, uh, misconduct and, and, discipline. Uh . . . It's completely irrelevant to this hearing.

MR. CLIFFORD: In response, Your Honor, if they comment on, on what should happen if these charges are proven. That is what I want to quote.

THE COURT: Objection noted. Overruled.

MR. CLIFFORD: Paragraph 17 of the order. Uh . . . First the Supreme court established a test that will apply in cases like this, and then the first element, they address in paragraph 17:

Applying these principles, we find an interim suspension warranted and suspend Woodruff effective immediately, pending the resolution of attorney disciplinary proceeding against him. First, the public will suffer irreparable harm if Woodruff continues practicing law prior to resolution of the disciplinary proceedings. Woodruff has 11 complaints against him, alleging conduct ranging from lying about filing a criminal appeal, to having several cases – and that one's not before us today – to having several dismissed with prejudice due to lack of diligence. Those two are before us. If true, these complaints . . . If true, and now they are true, now they are true. If true these complaints suggest Woodruff routinely fails to follow-through

regarding cases he takes. Woodruff's clients in turn permanently lose their claims. We decline to risk a similar fate for current and future clients.

So the Supreme Court has commented, hypothetically, on how severe they think these charges are, if true. Now they are true. So that's the Supreme Court's position. And, uh, even in these proceedings . . . I mean it's really ironic, even in these proceeding, at each step, Mr. Woodruff has failed to be able to respond timely or diligently in his own defense, faced with suspension or disbarment.

I mean the Supreme Court noted, in paragraphs 20 and 21. We also note Woodruff's behavior in this matter buttresses the credibility of the Disciplinary Committee's allegations. Woodruff waited six days before accessing File and Serve Xpress to review the application. He then proceeded the file his response late. Even after we put him on notice about filing timely responses, he filed a second request late as well. And then he filed his calendar less than an hour before this hearing. Clients at a minimum deserve attorneys who meet deadlines and proactively respond to court orders. Woodruff did neither in response to an application for interim suspension. If the threat of suspending his ability to practice law did not motivate Woodruff to make an effort to meet clearly defined deadlines, we have serious concerns about how he handles his clients' matters.

And then as the Court knows, when, uh, proceedings began in this Court, default was entered. Mr. Woodruff presented an email, in which he says he didn't know when he was served. How is it possible that an attorney who's been served with an original complaint of six disciplinary cases, he's interim suspended, he's facing all these charges. He then gets served with an amended complaint – First Amended Complaint – with three additional charges, totaling nine. How was it even possible? How was it conceivable that, in such an instance, he wouldn't know when he was served? It's either patently untrue, with respect, or else it proves the seriousness of the charges. And, and, it buttresses, as the Supreme Court says, the pattern here, and it shows why it's so serious.

One last point about the basis for the recommendation. Mr. Woodruff's has submitted two declarations following, uh, the, in, in these proceedings. One was the declaration of Ms. Lee on April 30th. That declaration and then the Ellis declaration he submitted on, uh, I put March 13th, but I, I guess March 13th, that's correct. Uh . . . When you look at them carefully, they actually show that he's . . . That, that, even the declarations that he self-servingly prepares and submits show that he's not diligent. That he doesn't timely respond. That the way to get him to respond, if at all, is by complaining to third parties. Uh . . . And I'll just go through this very briefly, but Ms. Lee . . .

**1451**

. . . disagrees, with the declaration, with the interim suspension. Of course, that's irrelevant. Under Disciplinary Rule 10, her position is irrelevant. Either he, uh, needs to be disciplined or he doesn't. She claims she didn't complain.

THE COURT: It says here . . . This is the, uh, declaration that was filed, uh, about 20 minutes ago?

MR. CLIFFORD: Oh, I didn't see any declaration filed 20 minutes ago.

THE COURT: Yeah.

MR. WOODRUFF: That's the same declaration. That's the one that was served on you on the, on the third, Tom.

MR. CLIFFORD: April 3rd, but it's the declaration of Ms. Lee Jin Hyun, and it's Disciplinary Case 2012-1. Is that correct?

MR. WOODRUFF: Yes.

MR. CLIFFORD: Okay. And so . . . Lets look at the time frame. Ms. Lee retained Mr. Woodruff in July, 2011. Uh . . . Six months later, she complained, in January 27, 2012. And then her declaration attaches the proof of receipts saying, oh, you know you USCIS . . . This was a USCIS application. USCIS did receive my application. But the USCIS receipt

shows it was received March 27, 2012. So, in other words, what happened is: six or seven months after she retained Mr. Woodruff, nothing was happening. She complains, USCIS, and I think maybe, Mr. Bellas, the Disciplinary Committee. Three months later, her stuff gets submitted.

So really, the declaration that was prepared as the best defense that he can mount on two-thousand-twelve-oh-one, it really only shows that he wasn't diligent, and that it took a complaint for him to respond. And it also shows he's not communicating with his client. That's why she had to go to third parties to find out what was going on. She couldn't go to him.

I will go through the Ellis declaration in detail. That was filed with the Court on March 13, 2013. That's two-thousand-eleven-fourteen. It's kind of a long and involved fact pattern, uh, but really the main point of the declaration is . . . that . . . It's the same point. She got frustrated. She went to USCIS and the Disciplinary Committee, and then only after she did that, did her stuff get processed.

So, uh, based on, on that, the pattern that's established, deemed admitted in the nine cases, what we've seen in the Supreme Court interim suspension proceeding, what we've seen in this, before this Court, in this proceeding, ehh, motion for reconsideration as well, and then, even the declarations that Mr. Woodruff has submitted in just two of the nine. All basically established this pattern that the Supreme Court was so con, concerned about if the charges are true, and now we know that they're deemed true.

So, uh, based on that, I would recommend the following discipline. Uh . . . Mr. Woodruff should either be outright disbarred, or else he should indefinitely be suspended. In either event, he should be ordered to make his clients as whole as possible, in the nine matters, and to pay the Disciplinary Counsel's fees and costs. If he is suspended, then the suspension should be indefinite, until such time as he can show the court that he can manage his practice and meet deadlines. And, of course, none of this is rocket science.

The court may take judicial notice, we are a very small community, that, uh, uh, Mr. Bruce Mailman and Ms. Maya Kara, have a practice, uh, one of the main focuses of which of is immigration. I know that they have a large volume of immigration clients. They haven't used that as an excuse not to timely service their clients or be on top of their docket. And, of course, there's a lot of different systems that an attorney can use. Ehh, you know, there's different software products. Some of them are integrated with time and billing, some are stand-alone.

I use a physical calendar. But even if you use a physical calendar, Mr. Woodruff has, has at least one secretary. Then there is no reason why things can't be stamped received and calendared some, some fashion. There's so many different systems. There's books on how to run law practices. There's just so many ways. But until he can satisfy the Court that he has some kind of system, such that he doesn't . . . if he's not disbarred, if he's indefinitely suspended . . . until he can satisfy the court that he has some kind of system, such that won't routinely, uh, miss deadlines, fail to appear, always seem to be asking for extensions, always show up in court and raise matters that aren't before the Court, that should have been brought by motion. He's gotta be able to do that. Otherwise, the concerns that the Supreme Court relied on for the interim suspension, which are now deemed true, aren't addressed. He's gotta be able to address those concerns. Uhm, so what I would propose to next, if the Court would like. I'm not sure how the Court wants to handle this, but, uh, I have, uh, specific recommendations with respect to each of the nine, and we could just those one at a time.

THE COURT: Yes, go ahead.

MR. CLIFFORD: Okay, uh, for two-thousand-nine-.

**1456**

MR. CLIFFORD: oh-five. I'm sorry, let me take that back. For Ms. Lee, two-thousand-twelv- oh-one, and Ms. Ellis, two-thousand-eleven-fourteen, I would agree that, uh, since they

signed declarations that they don't want anything, they shouldn't get anything. I don't think the Court should give them any compensation. Uh . . . Eh, I think those are still good charges, uh, and should be taken into consideration in the overall discipline order, but when we're talking specifically about what compensation to award each of the nine complainants, I think those two complainants should be awarded, uh, nothing because they said they don't want to see Mr. Woodruff pursued. And then, if the Court wants, we can just take these, uh, like, in these groups, and allow Mr. Woodruff to respond.

THE COURT: Go ahead.

MR. WOODRUFF: Your Honor, I will first, uh, respond to Mr. Clifford's, uh, general, uh, remarks. Which he made a number of factual assertions and arguments that, one, are not true and, secondly, are not part of the factual allegations that are in the complaint and that therefore the Court considers deemed admitted. And what is deemed admitted is not the charges. What is deemed admitted is the factual allegations. That's what the law of default is. All legal issues remain open and are not determined on the basis of, of a default. And I respectfully submit, Your Honor, that even the, uh, taking all the factual allegations of the complaint, as, the First Amended Complaint, as true doesn't, uh, provide a basis for a finding of misconduct on those various allegations, uh, that are in the complaint. Uh . . . Now some of the factual allegations are not correct, as, had, as I previously pointed out. Uh, and I don't feel that the Court gave full credit, uh, in my motion, uh, uh, in, what on my submission on the request to set aside the default. The Court, uh, basically discounted the Esperanza Ellis' declaration, and, uh, did not address the other issues that I put in, uh, what I had put in there. I do believe that if, that I had in fact very clearly shown . . . In fact the Esperanza Ellis' declaration alone, uh, clearly showed that I had a viable defense. Uh . . . And . . . So the, uh, the default should have been set aside.

MR. CLIFFORD: Your Honor. I'm gonna . . . Let me . . . I think . . . I'm going to object, I mean. I want to give Mr. Woodruff, uh . . .

THE COURT: Yeah.

MR. CLIFFORD: I don't object to Mr. Woodruff having his chance to speak, but we're really not here to talk about whether the default should have been entered. My general remarks went to pattern.

MR. WOODRUFF: And, and . . .

MR. CLIFFORD: The basis of my recommendation is pattern.

MR. WOODRUFF: And I'm . . .

MR. WOODRUFF: So the purpose of today, let's take out those two. For pattern. And then, pattern, there's still seven left.

MR. WOODRUFF: I'm, I'm going there, uh, Mr. Clifford.

THE COURT: Well, go there fast, because I was going to interrupt myself. I'm not going to hear, uh, reargument on your motion for reconsideration.

MR. WOODRUFF: Right. And that's not . . .

THE COURT: The Court has ruled on. So . . .

MR. WOODRUFF: That's not . . .

THE COURT: As far as the default judgment, it does take the, uh, allegations as, as true. So go ahead.

MR. WOODRUFF: That's . . . The factual allegations are taken as true, that is correct, Your Honor. And what I am trying to do is to, as much as possible, clarify the factual, uh, context. And, uh, one very important fact here is that in preparing the First Amended Complaint,

Mr. Clifford relied solely on the information supplied to him by the Disciplinary Committee. He did not do not do any independent investigation of his own, and there are some very significant material omissions, uh, from, uh,

THE COURT: Mr. Woodruff . . .

MR. WOODRUFF: . . . that information.

THE COURT: I'm, I'm not going to go there.

MR. WOODRUFF: Well, that goes to . . . That's a Rule 11 issue, Your Honor. I will move on from there, . . .

THE COURT: Good.

MR. WOODRUFF: . . . but it's important to make note of that. Uh . . . and, uh, Mr. Clifford put very great emphasis on the Cambronero and Feliciano cases. Uh . . . And . . . The Cambronero and Feliciano cases were both already heard in this Court. Both of those individuals, after essentially being encouraged to do so, uh, improperly in my opinion, uh, brought civil actions against me in this court

**<u>1501</u>**

for alleged, uh, breach of fiduciary duty, alleged attorney, uh, malpractice, uh, alleged breach of contract. Both of those cases were heard in front of Judge Inos. And in both of those cases, Judge Inos found in my favor. And the circumstances of those cases, that was omitted from Bar's presentation to the Supreme Court. It was omitted from the First Amended Complaint. Uh, and . . . Those cases are very important. There're, there's greatly misrepresented, uh, and, you know, I don't want to spend a lot time talking about it, Your Honor, but both these cases, the clients paid a minimal amount for, to, for me to assist them with something.

THE COURT: Mr. Woodruff, I'm, I'm not going to go into that.

MR. WOODRUFF: Well, okay, but in both of those cases judgment was already rendered by the Commonwealth Superior Court in my favor. On basically the same thing that is the basis for these complaints. And the Disciplinary Committee has aggregated six years of complaints in order to contend that I have some kind of, uh, pattern of not effectively and properly representing my clients. And, that . . .

There is a pattern in my practice, Your Honor, but not the one that they are alleging. The pattern in practice in my practice is that I represent an extremely large number of individuals who are low income, disadvantaged, politically and economically, who have causes that need to be furthered. In the, in the twelve years I have been in private practice I have effectively represented well over a thousand clients. The complaints that are involved here that have been presented to the Disciplinary Committee represent less than one percent of all of my clients.

Mr. Clifford talks about Ms. Lee's case, but he doesn't know anything about the facts, and he doesn't know anything about practicing before the, uh, USCIS. He doesn't know anything at all about immigration practice, which is why he doesn't know what he is talking about when he comes in here. Sometimes USCIS screws up. There are multiple cases, in my practice, and the Warfle case is actually even one of them, where USCIS puts a document on the shelf or whatever and doesn't process it in a timely manner.

Mr. Warfle in his case . . . The issue in his case, I thought, when the matter was brought to my attention, was the issue of him not showing up at the interview and therefore being deemed an abandonment denial, and, consequently, uh, they had to go through that process for reopening, which I could have done for them if Mr. Warfle hadn't lost his temper and refused to communicate with me.

But I called USCIS. I have documentary proof of the fact that I called USCIS. That documentary proof was provided to the Disciplinary Committee. That documentary proof was left out of what the Disciplinary Committee gave to Mr. Clifford, it was left out of the presentation to the Commonwealth Supreme Court. But when, I have and

that documentary proof included my phone record when I called USCIS and told them that Mr. Warfle could not be present at the scheduled time for the interview because he was somewhere else in the world. I don't remember exactly where, but he was . . .

MR. CLIFFORD: Indonesia.

MR. WOODRUFF: Huh?

MR. CLIFFORD: Indonesia.

MR. WOODRUFF: Okay. Thank you, Tom. Uh, because he's a merchant mariner. Okay. But . . . And I wrote a letter to USCIS that USCIS claims that they never received. Okay. I have three, over the various years I have . . . at least three, maybe as many as five, cases where USCIS had long delays that had nothing whatsoever to do with me. Uh . . . The . . . a VAWA application with USCIS takes, usually takes more than two years. This is, this the nature of things. So go fast, some go slow. You cannot tell what the situation is. Uh . . .

MR. CLIFFORD: If . . . if, if, if, Mr. Woodruf is going to go by specifics, I would propose we, we, we take a step back and then we just do them one by one maybe.

MR. WOODRUFF: I'm . . . Give me a moment, please.

MR. CLIFFORD: Okay.

MR. WOODRUFF: I'll review here and see where I wanted to go. I'm, I'm . . . When those particular points came up, uh . . .

**1506**

I objected to referencing the Commonwealth Supreme Court, uh, opinion, and then Mr. Clifford read from it. And then he says that what the Supreme Court's concerns were, that now they are true. No. That's not what is the situation. That's not what

the significance is. And the Supreme Court was operating from a completely different framework. And, and, uh, that's an argument, that, uh, is not the, the case. I, you know, one of the things that Mr. Clifford read out is of very great concern to me, because he said lying about filing a criminal complaint or a criminal appeal. Whatever it was. Okay. That's not true.

MR. CLIFFORD: It's not before the Court. That's not one of the nine.

MR. WOODRUFF: I understand that, but, you know, that's the Qun Yu case. And the, then in the Qun Yu case, Your Honor yourself referred that case to the Disciplinary Committee, even though Your Honor knows, because this, that case was tried right here in this courtroom. You Honor knows that, that the suggestion in that complaint that I was not prepared for that case and that I did not effectively represent Mr. Qun Yu is flat-out false. Uh . . .

THE COURT: Well, I, I never indicated the, that that was the case.

MR. WOODRUFF: You did not indicate whe – You just referred it to the Bar Association, Your Honor, but at the end of the trial you complimented the attorneys for both sides on their preparation and their presentation of that case. And . . .

THE COURT: That's right. You did a diligent job in trial, and your trial work is good.

MR. WOODRUFF: But Mr. Qun Yu's complaint said that I did not. The complaint said that I was not prepared . . .

THE COURT: His complaint was . . . the basis of his complaint was, as I recall, in that letter, which was why I referred it, was, uh, based on the, the, him losing the right to appeal, because you didn't contact him or anything else . . .

MR. WOODRUFF: Actually, that's that's . . . That was one of the things that he said, and I understand what Your Honor is saying with regard to that. That's, that's, that's incorrect, but

that's not before the Court so we don't have to get into that aspect of it. Uh . . . Fortunately, that's not part of this case. But, uh, uh, the only part of . . . that is a part where, Your Honor, would definitely be able to look at say, well, I don't know, okay, and I need to refer it over to find out and, uh . . .

Uh . . . In the Supreme Court, this argument about me not responding timely. That is unfair, unwarranted, and, and essentially incorrect. There was no filing deadline for submitting my calendar. The schedule was compressed. The Court originally tried to make me come and appear within . . . It was a very confusing proceeding, okay. The Court acknowledged the Disciplinary Committee had the duty to serve me with the Application, which they did not. And then because I had gone and gotten the application myself, they brushed it aside and called it as cured. And then they're saying I waited, that's a problem that it, it took me six days to get it myself when it clearly and acknowledgedly is not my legal duty to get it. It was their legal duty to provide it to me, in a timely fashion. And Mr. Bellas asked for, for me to be responding within 30 days on that application, and the Court gave me only 14 days. And I asked for a two week extension, which actually wasn't enough. The Court gave me only one. Everything was compressed in there.

Meanwhile, I'm serving my clients. Your Honor, in my practice, my clients' interests are paramount. That, that's a canard to say that, oh, it's a big deal the attorney is, is slow to respond when it's his license to practice that's at stake. That's not the issue, Your Honor. My license to practice and my economic interests are not the fundamental issue. It's my clients' interests.

And the Court talked about irreparable harm. The only irreparable harm caused in any instance whatsoever is the potential irreparable harm caused by the interim suspension, that deprived clients that need my services and are unable to find other attorneys that they can afford, or attorneys competent in that area of law or whatever at all, of my services.

And the whole process of being suspended on an interim basis creates enormous disruption. I had panicked clients calling me. I have to respond to these things. I have to try help them to find other attorneys. I have to, uh, uh, assemble client records and files so that, that, they can do their own thing or whatever like that. It's just extraordinarily burdensome and disruptive. And for, and Mr. Clifford is going to say that . . .

**1511**

He's even going to suggest that I was lying when I said that I wasn't sure what my deadline was. Come on, now. I'm operating in a chaotic environment created by all kinds of, uh, things that shouldn't have ever happened.

And again I go back, I have to go back . . . Yes, there is a pattern, Your Honor. There is a pattern that I work very, very hard for my clients. I handle a great many clients. I do it for. . . I give, I charge very affordable fees. I make people able to have, have themselves heard before a proper tribunal. Uh . . . So sometimes things are, are slow.

I, I, you know . . . Tom, you mentioned that there were, the, the two declarations. There actually . . . I just want to point out with regards to the Garde case. Ms. Garde got her decree of divorce. Ms. Garde told my secretary, uh, uh, I think on the third of this month, that as far as she was concerned, she was satisfied, and that, that there shouldn't be a complaint moving forward with regard to her case.

With regard to, uh, the, uh, the Sook case, the Kim, uh, Michael Kim case, uh, the, the, again, Mr. Simon Sin, who was the interpreter for that case, can, could easily provide a declaration as to the work that was done, that the work within the scope of the representation as described on the receipt, receipt was fully performed, and, and, and, uh, Mr. Kim and his mother, Ms. Sook, are not even in the Commonwealth anymore. They're now in the U.S., uh, mainland.

I suppose because the facts say one thing, that it's gonna be deemed admitted that, that I did something wrong in, in that case. But the truth of the matter is, Your

Honor, that I did not do anything wrong in that case. I did all of the work that I was contracted to do for. They did want more work done, but they didn't wanna to pay more money for the work that was to be done. And that was a representation that was limited in scope by the, by the written document. Which the Bar's, which the Disciplinary Committee never gave, as far as I know, to Mr. Clifford, and the Court has never seen. So the allegations in the complaint are actually misleading.

The, the, the statement that the only way that the work got done is for somebody to complain, complain is flat-out wrong. That is not true. That is not the way that I practice. Complaints didn't have anything whatsoever to do with the work being done. As a matter of fact, when the work was being done, with the exception of the Garde case, I didn't even know about the complaints. I hadn't been alerted to the fact or the existence of the complaint. The, uh . . .

Again, Your Honor, it's a volume practice. It's a practice that is committed to the needs of people that, that otherwise couldn't have access to justice. I charge very affordable fees. I have to manage this very large number of cases. I have done so for twelve years, Your Honor. More than twelve years. Very, very effectively. We have nine complaints here and probably twelve hundred clients I've effectively served during that time period.

THE COURT: Thank you, Mr. Woodruff.

MR. CLIFFORD: Your Honor, let me briefly rebut, if I may, on the general issue. The charges are deemed admitted. Rule 9(c). I'm reading it, I'm quoting from it. It's two sentences. "The complaint shall be served upon the respondent attorney, who shall be afforded 20 days after service of the complaint to file an answer. If an answer is not filed within that time, the charges shall be deemed admitted." The charges. "The charges shall be deemed admitted." Not the factual allegations, the charges. And, you know, counsel is aware of these disciplinary rules. He appropriately corrected me in calling myself "court-appointed counsel" when I should be calling myself "Disciplinary

Counsel." He's a very good attorney in, in certain ways. He's aware of this rule. He knows what would happen if he didn't respond.

Second, the Supreme Court order. He's mi-quoting it. They're saying, uh, Woodruff has eleven complaints against him alleging conduct ranging from lying about filing a criminal appeal – and we're taking that out – to having . . . I think that may be with me now, for filing.

**1516**

But, to having several cases dismissed with prejudice due to the lack of diligence. If true, these complaints suggest, suggest Woodruff routinely, et cetera the pattern. Uh, so there is a pattern. Uh, Mr. Woodruff talks about having a large economically-challenged, uh, uh, clientele. And, you know, I, I understand that from living here in our small legal community. I don't disagree with that. And we're not talking about . . . It's not like the military, we're not talking about life or death. We're only talking about people's money. And oftentimes their liberty. So it's still pretty important.

If you have a lifeboat that can take 20 people . . . safely . . . seas are rough. You take 20 people. You don't take 40 and say, oh, no one else would take them, 'cause you lose 40 people. You take the 20. And, the, the, the same analogy applies here. Mr. Woodruff is basically conceding that he is taking on more people than he can handle, and that's his excuse, somehow, for not handling them competently. He suggested that Mr. Cambronero and Mr. Feliciano only paid him a little bit. I'm not sure what that means. So if he has clients who only afford to pay him a little bit, it's okay not to show up for trial? as scheduled in a case management scheduling order?

He talks to, uh – and we'll address that when we come to it in the individuals . . . in more detail in the individuals – Ms. Sook, she's all taken care of. The investigator pointed out in the report, just like most of the investigators' reports point out with these charges, Mr. Woodruff received service, sometimes as registered mail, you know, here's the return receipt. And he never responds. He almost never responds. I can't say that's all nine, but I think in, in most ... I know in most of the nine he never responded, and maybe in all of the nine he never responded. So he puts himself in

this situation. He doesn't respond to the complaint at the Disciplinary Committee stage. He doesn't timely respond in the Supreme Court. He doesn't timely respond here. And now he complains. And he can't see the irony that's consistent with the pattern that the Supreme Court noted, and that, that I'm alleging. So there is a pattern.

And what I would suggest, Your Honor, is move on to individual, individual files.

THE COURT: Go ahead.

MR. WOODRUFF: Be- before he does that, I would like to point out one thing with . . .

MR. CLIFFORD: Well, I, it's . . . You spoke . . . I spoke, you spoke, I spoke.

MR. WOODRUFF: Just one thing. I would ask your indulgence, Tom. Just, because you're going to move through, move to individual cases, right?

THE COURT: What is it, Mr. Woodruff? Go ahead.

MR. WOODRUFF: Thank you. The suggestion that I don't respond to the Disciplinary Committee is completely incorrect, and it's, I'm sure Mr. Clifford, uh, just simply didn't know because the Disciplinary Committee didn't give him that information. But . . . I'm actually prepared to file with the Court very, uh, extensive evidence of the entire process of my responses, uh, uh, to the Disciplinary Committee. Mo– uh, most of these cases were investigated by Janet King. And, uh, for several years, uh, not advanced. Uh, only when she was about to leave the Disciplinary Committee did she issue, uh, reports that then were the basis for them to be, uh, referred. I'm not sure what the dynamic was inside the Disciplinary Committee that resulted in that. It was my reasonable understanding that those cases had been closed. But that, much to my shock and surprise, did not happen. That included the Cambronero case, uh, the Feliciano case, both which that, they had been informed of the judgments in the Superior Court, uh, and it included numerous other cases. Mr. Bellas in the Su–

Commonwealth Supreme Court submitted copies of certified, uh, uh, uh, receipts, representing that they showed service on me of the information about the disciplinary complaint, uh, for particular cases, and those representations were false.

THE COURT: Alright.

MR. WOODRUFF: I, I was able to connect them because I keep the records. And I can connect every re– everything that I received with a receipt number. And there's no receipt number that I have seen for any case where I contend I did not get it. In the Sook case, I was never, ever supplied with the opportunity to respond to the Disciplinary, uh, uh, Committee. There were a couple of instances, for particular reasons, when did not respond to the Disciplinary Committee. But my practice has always been to respond.

THE COURT: Alright.

MR. WOODRUFF: I do not, uh, leave the things . . . .

THE COURT: Alright, Mr. Woodruff. Mr. Clifford let's proceed with . . . .

MR. CLIFFORD: On the individual files, there's nine, Your Honor.

THE COURT: Yeah.

MR. CLIFFORD: So, again, on the first two . . .

**<u>1521</u>**

THE COURT: Uh-uh.

MR. CLIFFORD: And these aren't in order by the complaint, but I just try to make it . . .

THE COURT: Alright.

MR. CLIFFORD: . . . in a way that would be efficient. Ms. Lee is two thousand twelve one, and Ms. Ellis is two thousand eleven fourteen.

THE COURT: Right.

MR. CLIFFORD: I don't recommend that the Court order that they be compensated, based on their declarations.

THECOURT: Mm-mm.

MR. CLIFFORD: Mr. Woodruff?

MR. WOODRUFF: Well, I don't think that I have anything further to add with regard to Ms. Lee and Ms. Ellis.

THE COURT: Okay. Why don't you continue with the rest. Yeah.

MR. CLIFFORD: I just wanted to give him a, a chance to respond. Okay. Now I have specific recommendations on five, Your Honor, and then on two, I need to ask Mr. Woodruff, uh, questions.

THE COURT: Alright. Give me a number on the five.

MR. CLIFFORD: Two-thousand-eight-eight is the Warfles.

THE COURT: Zero-eight-zero-eight?

MR. CLIFFORD: Uh, yes, Your Honor. I recommend that, that the Warfles be refunded their $600 in attorney's fees. Those fees are documented by paragraph 4 of the First Amended Complaint. And, in that case, uh, also there in the First Amended Complaint, the bottom line, I think, is that 18 months after they retained him, they were denied. Uh, Mr. Warfle complained, and he hired me, to represent them, because other

merchant mariners that we know who proceeded pro se at that time frame were routinely completing the process within 90 days. After 18 months they were denied. Then they had to go out and hire their own attorney – or I think he did it on his own, let me take that back. But, in any event, uh, they had to restart. So my recommend-dation in oh-eight-oh-eight is that Mr. Woodruff be ordered to refund to the Warfles their $600 in attorney's fees.

THE COURT: Okay.

MR. WOODRUFF: Your, Your Honor, uh, with regard to Mr. Warfle, as Mr. Clifford, uh, said, he actually represents the Warfles in that case, and they did file a case in this Court with regard to that case. And, uh, I actually agreed, even though I maintain very firmly that there's no misconduct of any sort with, in regard to the Warfle case, I actually agreed with Mr. Clifford that I would refund that money. And, there, uh . . . For a number of reasons, some on my side and some on Mr. Clifford's, we never completed that process. So I actually agreeable to refunding the $600 to the Warfles, but I do not agree that there's attorney misconduct in that case. There were two things that, that, uh, Mr. Warfle indicated, uh, were what he thought was fault on my part. Uh, the, uh, I did not know until just very recently, that they were, actually until I read the complaint, that they were arguing that the initial, uh, delay between the time they filed out forms in my office and when it was submitted to USCIS was, uh, somehow, uh, fault on my side. And I thought it was only the question with regard to the failure . . .

MR. WOODRUFF: . . . of them to appear at the interview and the abandonment denial, which as I said, I would have been willing at no additional charge to have assisted them in that, but they chose, Mr. Warfle chose, to stop communicating with me.

Uh . . . With regard to the initial period, the fact of the matter is, is that . . . One of the things that has to be done before a green card application can be submitted – or usually the way that we do it – is to get the medical exam for the beneficiary so that it can be included in the application packet. And sometimes there are other

documents, tax returns, whatever, that have to come from the client before the application package can be sent in. Just because the forms are completed . . .

MR. CLIFFORD: You know. If I may. Since we agree on the, the, the, uh, order from the Court. And since the merits are already admitted. Maybe we can move on. Because there'll be some we're going to disagree on.

MR. WOODRUFF: Well, my point is, is . . . because, uh, you know, I have this, . . . I have the issue about the merits being admitted. Okay? And, and . . .

THE COURT: Yeah. I . . .

MR. WOODRUFF: . . . I just emphasize that there is no misconduct in this case.

THE COURT: Alright. [Unintelligible]

MR. CLIFFORD: Oh, I'm sorry, Your Honor.

THE COURT: Yeah.

MR. CLIFFORD: The next one is two-thousand-eight-dash-twelve. And I don't know how to pronounce this gentleman's name, I apologize. Mr. Bhang?

MR. WOODRUFF: Bah-ing.

MR. CLIFFORD: Baing. Mr. Baing. This is where, uh, Mr. Woodruff failed to file the Labor Case appeal for Mr. Baing. Uh, and, uh, Mr. Woodruff told the investigator, uh, the Disciplinary Committee investigator, that the main purpose was to, uh, help him remain in the Commonwealth. Mr. Baing did only pay $50 in attorney's fees, but the appeal was never filed.

**1526**

So I recommend that Mr. Baing be, uh, reim-- refunded his $50 in attorney's fees plus liquidated damages of a thousand dollars. And that really is an arbitrary number. He, he . . . The appeal was never filed, and so . . . uh, you know, that's . . . That's a liquidated damage number because the appeal was never filed. Plus fifty in attorney's fees.

THE COURT: Alright.

MR. WOODRUFF: Your Honor, it's not correct. Okay? And I'm not sure what the exact allegations, wording of the actual allegations in the complaint are. Uh, if the allegations in the complaint do not conform with the facts as were known to the Disciplinary Committee, there is a very serious problem. And in this case, as in, uh, the others, I can readily supply to the Court extensive documentary evidence of what actually happened.

THE COURT: Well, I'm not interested in what happened. That's been already decided.

MR. WOODRUFF: Well, Your Honor, in . . . Mr. Clifford takes the position, which I disagree with, that the charges, and not just the factual allegations, are themselves, in other words, the misconduct . . .

MR. CLIFFORD: It's the rule.

MR. WOODRUFF: . . . itself. I understand that, but I don't think that's a proper construction of the rule. That they're all deemed admitted. That's not a proper construction of the rule. Uh . . .

THE COURT: Alright, again . . .

MR. WOODRUFF: Regardless, the Court, in making a decision on discipline, is required to take into consideration all of the facts and circumstances that relate to that matter. And the facts and circumstances are that the appeal was filed. The appeal was filed . . .

THE COURT: The facts and circumstances would have, should have been presented with an answer and at a hearing. Which wasn't . . .

MR. WOODRUFF: Which I attempted to do. And I appeared . . .

THE COURT: Mr. Woodruff, I'm not going to keep rearguing subparts of the, you know, the default, and the Court's order refusing to set it aside, and the Court's order denying your motion for reconsideration. They all deal with what you are saying you could have told this and this and this and this and this. But you didn't. And the Court found good cause . . .

MR. WOODRUFF: But I . . .

THE COURT: . . . to not set aside the default.

MR. WOODRUFF: But I . . .

THE COURT: So I'm not going there.

MR. WOODRUFF: That is one thing. The separate issue . . .

THE COURT: You are here today given the courtesy to talk, as a defaulting party, to the, to the sanctions that are being recommended.

MR. WOODRUFF: Right.

THE COURT: That's it.

MR. WOODRUFF: And Mr. Clifford . . .

THE COURT: Not to the facts.

MR. WOODRUFF: And Mr. Clifford is recommending that I be required to refund to Mr. Baing a $50 fee. That wasn't an attorney's fee actually. It was $25 for the cost of the appeal, which was filed, and the $25 was paid, and $25 to cover costs associated, you know, costs of copying and so on that related to that. What was not filed in Mr. Baing's case was a formal written brief, to the Secretary, with regard to that case. And Mr. Baing achieved the result that he hired me to obtain for him.

And there are other aspects of this that are problematic, which is that, Colin Thompson, among them, that Colin Thompson is the one that gave the case to me, Colin Thompson was involved in it becoming a disciplinary complaint, at the time that Colin Thompson was a member of the Disciplinary Committee. That is problematic also. But, uh . . . that's also in the record with the Disciplinary Committee.

THE COURT: Alright. Mr. Clifford, next.

MR. WOODRUFF: So no, no refund of $50 or any arbitrated liquidated damages is appropriate.

MR. CLIFFORD: I'll, I'll just note this one time. Obviously, this, a transcript of these proceedings may be considered by the Supreme Court on appeal. But, you know, it's tempting to respond to these point by point to the extent I can off the cuff. I didn't prepare to respond to these because that's not before the court today, but many of them I know off the cuff. That handwritten note that Mr. Woodruff submitted was not deemed a, a proper appeal. It wasn't deemed an appeal. And so did he file something physically? Did he submit a handwritten note? Yes. But it wasn't deemed an appeal. But, but, the point I am trying to make, for the record, in the event the Supreme Court considers this, is Disciplinary Counsel isn't going to respond to these point by point. I'm not prepared to do that.

THE COURT: Alright. Let's move on to the next case.

MR. CLIFFORD: Okay.

MR. WOODRUFF: Your Honor, I . . .

THE COURT: Nah! That's it, Mr. Woodruff, on this.

MR. WOODRUFF: But, Mister . . .

THE COURT: I'm not hearing anything else on this matter.

MR. WOODRUFF: He made a misstatement, Your Honor.

THE COURT: Mr. Woodruff, I'm making a ruling. I'm not hearing anything else on that matter. Move on.

MR. WOODRUFF: Mr. Clifford makes a misstatement, . . .

THE COURT: Mr. Clifford.

MR. WOODRUFF: . . . I'm not allowed to correct it?

THE COURT: One more time. I'm not hearing anything else on that matter from you. Mr. Clifford.

<u>1531</u>

MR. CLIFFORD: Two-thousand-eleven-dash-twelve. The, Ms. Garde?

THE COURT: Wha–

MR. CLIFFORD: Is that how it's pronounced?

MR. WOODRUFF: Yes. That is correct.

THE COURT: What's, what's the number again?

MR. CLIFFORD: It's two-thousand-eleven-twelve. Ms. Garde. Failed to timely complete a divorce or submit a proposed decree of divorce. The divorce decree was completed. Uh, she paid a total of twelve hundred in attorney's fees. But it took her, uh, many months to get it. And she, uh, was told by Mr. Woodruff that it was with the Court. She went to the court. She was in a hurry. The court said we don't have it, but finally they got it. So the divorce was completed. Based on that, I recommend that Mr. Woodruff be ordered to refund three hundred of the twelve hundred of attorney's fees, for untimely processing of the decree.

THE COURT: Okay, next.

MR. WOODRUFF: Yeah. Your Honor, uh . . . I will leave that to the Court's discretion, but I would point out to the Court that Ms. Garde told my secretary that she is fully satisfied with the representation as of this, uh, as of this time.

THE COURT: Okay.

MR. CLIFFORD: Two-thousand-eleven-thirteen. This is the Ms. Reyes green card application. Uh, the best information I have is, and it's similar hearsay, but my secretary was able to reach her, and she said that everything was completed, uh, eventually, but completed. And so, I recommend that, uh, Mr. Woodruff be ordered to refund five hundred, of the twenty-five hundred and ten, uh, that she paid in attorney's fees . . .

THE COURT: Alright.

MR. CLIFFORD: . . . in fees and costs.

MR. WOODRUFF: I disagree, because I don't think that Ms. Reyes is asking for that. But, you know, if Ms. Reyes wants five hundred dollars refund from me, I certainly would not object to giving to her, 'cause she's my client. I want her to be happy.

THE COURT: Okay.

MR. CLIFFORD: The final one of these five, before we come to the final two. Two-thousand-twelve-dash-oh-four. Two-thousand-twelve-dash-oh-four. Uh, Ms. Kim paid Mr. Woodruff a thousand dollars to provide legal services in connection with her son and possibly to set aside, for the set aside of a divorce decree. Uh . . . And uh . . .

MR. WOODRUFF: Adoption decree, Tom. Adoption.

MR. CLIFFORD: Okay. But . . . That's what I have written in the investigator's report. But . . . And I thought from her complaint, but Mr. Woodruff never took any action. Uh, I would recommend that he be ordered to refund the thousand dollars in attorney's fees. And, and obviously, I guess . . . In fairness to Mr. Woodruff, if he completed the legal services after the Disciplinary Committee completed its investigation and referred to me, I was not able to get back in touch with her.

MR. WOODRUFF: No, Your Honor. The legal services were completed in full according to what was contracted, uh, well before the complaint was ever filed. And this was one of the complaints that I never was informed even existed from the, from the Disciplinary Committee, and I did not even know about until Mr. Bellas filed his application with the Commonwealth Supreme Court. That was the first notice and knowledge that I had of this complaint at all. Now, Mr. Simon Sin, the Korean interpreter who assisted with this case, knows all the facts of the case. It was a limited representation. I was to look into a particular problem. I did that. I found case law that it was a very difficult thing they wanted to do, almost impossible, to set aside an adoption. They met with me. I explained all that to them. They said well go ahead and try. I said, well, you're going to have to pay additional fees. They didn't want to pay the

additional fees, and then apparently filed a complaint after that, because I did not do additional work . . .

THE COURT: Okay.

MR. WOODRUFF: . . . without being paid additional fees.

Ct. Thank you, Mr. Woodruff. The Court . . .

MR. CLIFFORD: Just a brief rebuttal, Your Honor. Or partial agreement. I think my complaint got it right, my notes her did not. It is an adoption decree. We agree on that. But the basis, the focus of Ms. Kim's note, her handwritten complaint, was, uh, legal services in connection with her son's immigration status.

Uh, Adam Hardwick was the investigator. And, uh, on June 4th, he sent a letter to Mr. Woodruff. This is not a certified, uh . . . there is no, certified . . . It didn't go by certified mail. So all I can document is that they sent the letter, and Mr. Woodruff never responded.

THE COURT: Alright.

MR. WOODRUFF: Actually . . . I do want to clarify, Your Honor, and thank you, uh, Tom, for mentioning that this was one of Mr. Hardwick's cases. Which is one of the cases that suffered from Mr. Hardwick's conflict of interest.

<u>**1536**</u>

But I'll set that aside. And Mr. Clifford has just reminded me . . . Actually, Mr. Hardwick sent me, uh, a . . . Ordinarily the Disciplinary Committee first sends out a notice that says that a complaint has been filed, and then they appoint an investigator, and then the investigator contacts the attorney and supplies the facts of the, uh, uh, complaint. And, uh, Mr. Hardwick did . . . not long ago. This is all fairly

recent. Uh, send me a letter in which there were two or three cases. Uh, that he had been assigned to investigate.

And I correct what I said earlier, in that actually Mr. Clifford is correct, that that letter did include this particular case, but I did not realize that that letter included this particular case until after . . .

THE COURT: Alright.

MR. WOODRUFF: . . . the filing . . .

THE COURT: Thank you.

MR. WOODRUFF: . . . in the Commonwealth Supreme Court.

THE COURT: Next, Mr. Clifford.

MR. CLIFFORD: There's two remaining, Your Honor. And on these, if the Court will allow me . . . It is a disciplinary proceeding, and he's the respondent. I would like to ask Mr. Woodruff questions. It's Mr. Cambronero and Mr. Feliciano's case. I would like to ask him questions regarding what he thought he could potentially recover with the complaints. And I have, for the convenience of the respondent and the Court, copies of the complaints. So we can look at those.

THE COURT: Well, uh, I . . .

MR. CLIFFORD: I'll start . . . Is that permissible, Your Honor?

THE COURT: I don't think . . . This, this isn't . . . It's not consistent with default.

MR. CLIFFORD: Well, Your Honor. I, what, what I don't want to get to the merits of it. Uh, what I want to get to is, uh, in my opinion, and the Court may disagree. For the Court to

enter an appropriate order of discipline with respect to the disciplinary cases involving Mr. Feliciano and Mr. Cambronero, the Court needs to get some sense of what would have been recovered.

In other words, both of these gentlemen lost their cases. They had discrimination cases claiming discrimination damages, punitive damages, uh, direct economic damages for lost income, breach of contract. They lost all that, when their cases were dismissed with prejudice. And then, in the one case, I don't have my notes in front of me, an appeal was dismissed as untimely. So the Court might consider it appropriate to compensate them in some way. Uh . . . But, if the Court doesn't want to get into what Mr. Woodruff was, was alleging for damages, then I would recommend some kind of liquidated damages at a higher level, perhaps five or ten thousand dollars. But that's without knowing, you know, what the cases were beyond what was alleged in the complaint, which is very serious, and potentially could result in seriously substantial attorney's fees.

MR. WOODRUFF: Your . . .

MR. CLIFFORD: I'm sorry, attorney's fees for the counsel but damages for the clients.

MR. WOODRUFF: Your Honor. Uh . . . The . . . Mr. Clifford is on the right track. What he's asking about is important. Alright. Uh . . . But this where . . . it's unfortunate that, that, uh . . . and I don't know how this occurred because the Disciplinary Committee knew this . . .

THE COURT: Let's not go there, Mr. Woodruff.

MR. WOODRUFF: Okay, okay. Let me just make it simple. Alright? Mr. Cambonero's case. Mr. Cambronero was employee of RNV Construction, as an electrician. He had a heart problem, and he went to the Philippine for medical treatment. And the doctor in the Philippines recommended a medical procedure for his heart. And this was during the time of his employment by RNV Construction. And the owner of RNV

Construction was actually even in the Philippines part of that time. The . . . cost in the Philippines for the medical procedure that was being recommended by the cardiologist is $10,000, and our position was that the employer is supposed to pay that $10,000. The employer did not pay the $10,000. The employer has his position with regard to that. The employer's position was that Mr. Cambronero was actually not going to undergo the procedure but was trying to shake him down for $10,000 he was going to pocket. That was the employer's position. In any event, the, nothing was paid. Mr. Cambronero came back to Saipan . . .

**<u>1541</u>**

. . . and was fired or not renewed. I think not renewed. Uh . . . And then he came to me. And he paid me . . . He asked me for help. And he paid me $100 so he would be contributing a little something to his case. Uh . . . And . . . to help with the costs of running my office. And we expressly agreed that the only thing we were trying to obtain in that case was for, to, the employer to pay directly to the medical provider in the Philippines for the medical procedure. That no money was to go through Mr. Cambronero's hands. Those were the conditions under which I, uh, took on the representation. Because I didn't want . . .

THE COURT: Okay, so we're, we're talking about the $10,000 estimated medical expense, right?

MR. WOODRUFF: Right.

THE COURT: Okay.

MR. WOODRUFF: Which was only medical expense. That's what it was to be.

THE COURT: Alright.

MR. WOODRUFF: And we agreed that, that, you know, that if we had to litigate and there were attorney's fees awarded in the case, those would be mine. But that would . . .

THE COURT: Mm-mm.

MR. WOODRUF: That would, that would be it.

THE COURT: Okay.

MR. WOODRUFF: Mr. Cambronero was not, was . . . The terms of the representation, when I undertook it. was not for the purpose of getting damages or financial gain for Mr. Cambronero.

THE COURT: Alright. That answers the query that Mr. Clifford had.

MR. CLIFFORD: And I'll accept that, Your Honor. I didn't want to interrupt Mr. Woodruff. But based on that, I recommend that Mr. Woodruff be ordered to pay Mr. Cambronero $10,000, for the heart procedure, and $100, uh, for his attorney's fees back.

MR. WOODRUFF: Your Honor, why would I have to pay $10,000 for heart procedure that Mr. Cambronero no longer needs, apparently? That was the whole thing with Mr. Dotts' defense of the case, all of the evidence that was brought up by Mr. Dotts. Mister . . . that RNV Construction spent over $40,000, 'cause Mr. Dotts told me . . .

THE COURT: So this case went to trial?

MR. WOODRUFF: . . . to defend . . . No, the case did not go to trial. But RNV Construction spent over $40,000 on the, uh, uh, attorney's fees for O'Connor Berman Dotts & Banes to defend against my representation, my very vigorous representation of Mr. Cambronero, that was a limited representation. And I wasn't even required to go to the CNMI Department of Labor, but I did it as a favor to Mr. Cambronero after we were dismissed in the Federal Court. The Federal action was primarily a tactical, uh, action, be-- to try to . . . We were still trying to get Mister . . . the, the employer, to, uh, drop the, uh, defenses they were making and agree to pay for this procedure. That was what we were still

THE COURT: Alright

MR. CLIFFORD: Just very briefly, Your Honor.

MR. WOODRUFF: I have, I have . . . just one last point I have to make with regard to that.

THE COURT: Go ahead.

MR. WOODRUFF: Because part of the argument is that, because I did not oppose the motion for summary judgment, that somehow I did something wrong. This is the problem of not knowing, the case, and then trying to form opinions just because, uh, there was no opposition, or because a motion was lost or something like that. The, the . . . I could not, under . . . based on what Mr. Dotts had adduced, and brought forward through Mr. Cambronero's testimony, in very lengthy deposition, and had put before the, before the federal Court, I could not, consistent with Rule 11, have made an opposition to that summary judgment motion. So what I did . . . on the Federal claims. So I asked the Court to dis– to go ahead and dismiss the Federal claim, claims and preserve the . . . state law claims, . . .

THE COURT: Okay. I understand your . . .

MR. WOODRUFF: . . . which Judge Munson, in his discretion, chose not to do.

THE COURT: I, I understand your point.

MR. CLIFFORD: But I guess, you know, briefly, in response, Your Honor. Judge Munson chose not do so, because the Federal Rules provide that you have to file an opposition to a motion for summary judgment, and there should have been an opposition, in part, on, on those issues. Not on the issues that he couldn't; we'll take that as true. Not on the issues that he says he couldn't defend, but there's also the parallel labor case that wasn't pursued and it was dismissed for failure to be pursued.

MR. WOODRUFF: Your Honor.

MR. CLIFFORD: And, and, if you'll let me finish. Mr. Woodruff is talking about the malpractice cases. Of course, the malpractice cases in Cambronero and Feliciano, those aren't before the Court. Who knows what happened there? Those are different legal standards. What's before the Court here are the rules cited in those portions of the complaint that go to competence . . .

**1546**

. . . and diligence and communicating with your client. Those are established by the failure to file.

THE COURT: Alright, let's move on. Let's move on to the next . . .

MR. CLIFFORD: The last one, Your Honor, is Mr. Feliciano.

MR. WOODRUFF: Your Honor, I would like to be heard.

MR. WOODRUFF: May I speak, Your Honor?

THE COURT: Well, I, I've heard enough on that case without starting, going . . . We're opening the door to the merits already.

MR. WOODRUFF: Well, he referred to the, he referred to the labor case which was actually not, I mean, it was not really part of the thing. But most importantly, he made, he made a misstatement of the Federal Rules, and of the facts, that we were just discussing. The Federal Rules say that you file an opposition or you file a statement of non-opposition, which a statement of non-opposition with a request to, to, uh, keep the state law claims is precisely what I filed.

THE COURT: Okay.

MR. CLIFFORD: The next one, Your Honor, and the final one, is, uh, Mr. Feliciano. And that's two-thousand-nine-dash-oh-one, two-thousand-nine-dash-oh-one. And that case was, what's, the charges that are deemed admitted. Mr. Feliciano's case was dismissed for a failure to appear for trial. And of course there's all those court orders, the dismissal of the appeal, et cetera. I recommend that the three hundred in attorney's fees be refunded. Those are established by paragraph 89 of the First Amended Complaint. And then, I'll defer to the Court, of course, but somehow we need to figure out, uh, I believe, what's reasonable compensation for Mr. Feliciano. The allegations in the complaint are that he was discriminated against, fired by Eastern Hope Bunraku and Rakuan Keeraku. You know, the Japanese-Korean place before. Eastern Star or Eastern Hope Corporation. Fired based on discrimination, or non-renewed. So the complaint seeks punitive damages, unpaid wages. They're very serious damages sought in the complaint.

MR. WOODRUFF: Your Honor, first, Mr. Clifford has argued, because both these cases involve judgments in my favor in this court. And he has argued that that's a different standard. And it's not a different standard. It's the same standard plus different types of complaints. Uh . . . The contentions made, in small claims court, in front of Judge Munson, were breach of contract, breach of fiduciary duty, legal malpractice. Legal malpractice is the same standard that we're talking about here. And I, the cases were fully heard. The actual information about what happened . . . the complete understanding of the case. The case file like this, six inches thick, were, in the courtroom, with me. Those were decided.

Okay. Now, for Mr. Feliciano's case. What was . . . Mr. Feliciano had an extremely weak case. I agreed to take on his case, because, it was a colorable case . . . We hoped . . .

MR. CLIFFORD: With respect, what does any of that have to do with the case being dismissed for failing to appear for trial on the date set for . . .

MR. WOODRUFF: For medical reasons, as the record in that case makes . . .

THE COURT: Alright.

MR. WOODRUFF: . . . very, very clear.

THE COURT: I'm interested . . .

MR. WOODRUFF: And that was also the point in, in Judge Inos' courtroom.

THE COURT: I'm looking at this with very nar– . . . with narrow, narrow, uh, guide here, and that's any damages.

MR. CLIFFORD: No other basis, Your Honor. And I've tried, just for the record here, to contact Mr. Feliciano. We've been unable to reach him. But, uh, I recommend then that the Court award liquidated damages in the amount of $10,000 plus the attorney's fees of three hundred.

MR. WOODRUFF: Your Honor, Mr. Feliciano's case was an extremely weak case. If we had actually been able to try it that day. If I had not, uh, uh, had that situation of vertigo so that I was at the CHC emergency room the night before and under direct doctor's orders to be there at the time that I was supposed to be in court, and notification was given. If the case had gone to trial, ninety percent probability it would have been judgment in favor of Eastern Hope. It's as simple as that. Mr. Feliciano was a Filipino claiming . . .

**1551**

. . . uh, national origin discrimination against an employer that had, and continued to have, Filipino employees. He . . . and, and . . . that operates two restaurants, and they transferred some across, and they closed one of the restaurants and so on like that. His . . . one of his principal arguments that the, was that the employer was using what he called "ghost employees," people that didn't have . . .

THE COURT: Okay, I don't need . . .

MR. WOODRUFF: . . . legal immigration status.

THE COURT: I don't need to hear all of this, Mr. Woodruff.

MR. WOODRUFF: The likelihood of there being any significant award of damages in the bench trial was essentially nil.

THE COURT: Okay, thank you. Anything else, Mr. Clifford?

MR. CLIFFORD: So just in, in sum, Your Honor. What I recommend for, uh, discipline against Mr. Woodruff is that the Court either disbar Mr. Woodruff or suspend him indefinitely. In either event, I think the Court should order, uh, Mr. Woodruff to pay Disciplinary Counsel's fees and costs, and to pay, uh, the nine complainants pursuant to what my specific recommendations were. If the Court orders indefinite suspension instead of disbarment, then I recommend that the Court, uh, make the, uh, reinstatement into active practice conditioned upon Mr. Woodruff somehow, through some process, satisfying the Court that he would be able to competently and diligently manage his law practice.

THE COURT: Thank you.

MR. CLIFFORD: Thank you, Your Honor.

THE COURT: Any last statement, Mr. Woodruff.

MR. WOODRUFF: Your Honor, I would respectfully submit that, that, uh, . . . at most private reprimand is the appropriate, uh, sanction.

THE COURT: Thank you. Alright, the Court will issue its, uh, ruling within the time provided for in the rules. I think it's twenty days. If nothing further, we'll stand in recess.

MR. WOODRUFF: And, thank you, Your Honor, for hearing, uh, what I had to say.

THE COURT: Yeah.

# CERTIFICATION

I hereby certify that the foregoing transcript of proceeding on May 15, 2013, before JUDGE DAVID A. WISEMAN in the case of:

**IN RE THE MATTER OF STEPHEN C. WOODRUFF**

**Respondent**

**Civil Action No. 13-0017**

is an accurate, verbatim transcript from the digital audio recording from the Commonwealth Superior Court.

CATHERINE A. TORCULAS
PMB 652 Box 10003
Saipan, MP 96950
Tel.: (670) 235-1913

Completion Date: April 21, 2014